Board of Prison Terms Hearing Transcript
13 September 2005

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )            CDC Number E-81550
                          )
JAIME MIJANGOS            )
                          )
_____)

INMATE COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTEMBER 13, 2005

PANEL PRESENT:

Ms. Susan Fisher, Presiding Commissioner
Ms. D.H. McBean, Deputy Commissioner

OTHERS PRESENT:
Mr. Jaime Mijangos, Inmate
Ms. Kateria E. Rutledge, Attorney for Inmate
Mr. Jack Delavigne, Deputy District Attorney,
Los Angeles County
Correctional Officer, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No      See Review of Hearing
_____   Yes     Transcript Memorandum

Judy K. Farncomb          Peters Shorthand
Reporting

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 7 |
| Pre-Commitment Factors | 21 |
| Post-Commitment Factors | 34 |
| Parole Plans | 26 |
| Closing Statements | 59 |
| Recess | 63 |
| Decision | 64 |
| Adjournment | 69 |
| Transcriber Certification | 70 |

--oOo--

1.

1                    P R O C E E D I N G S

2          DEPUTY COMMISSIONER McBEAN:  Okay, we're

3    on record.

4          PRESIDING COMMISSIONER FISHER:  All

5    right.  Do me a favor before we get started and

6    pronounce your last name for me.

7          INMATE MIJANGOS:  Mijangos.

8          PRESIDING COMMISSIONER FISHER:  Mijangos.

9    I wanted to make sure that I'm saying it right.

10   Okay.  This is going to be a Subsequent Parole

11   Consideration Hearing for Jaime Mijangos, CDC

12   Number E-81550.  Today's date is 9/13/05.  We

13   are located at Correctional Training Facility,

14   at Soledad.  The inmate was received on 3/27,

15   I'm sorry, 1/9/91, from Los Angeles County.  His

16   life term began on 3/27/92, and the minimum

17   eligible parole date is 6/25/02.  The

18   controlling offense for which the inmate has

19   been committed is second-degree murder, Case

20   Number BA019784.  Count One, Penal Code

21   Section 187.  There was a finding in that Count

22   of the use of a firearm.  That's Penal Code

23   Section 12822.5.  There was also a Count Two,

24   which was assault with a deadly weapon, Penal

25   Code Section 245A1, and also with a finding of

26   great bodily injury, which is Penal Code

27   Section 12022.7, both of those were stayed.  The

2

1    inmate received a term of 18 years to life.

2    Once again the minimum eligible parole date is

3    6/25/02. And we are going to tape-record today.

4    So, for the purpose of voice identification for

5    the transcriber, we are each going to say our

6    first and last names, spelling our last name.

7    When I get to you, I need your CDC number. All

8    right.

9        INMATE MIJANGOS:  Do I say it now?

10       PRESIDING COMMISSIONER FISHER:  No, I'm

11   going to start with myself and go this way.

12   Okay, starting with myself and going to my left,

13   Susan Fisher, F-I-S-H-E-R, Commissioner.

14       DEPUTY COMMISSIONER McBEAN:  D.H. McBean,

15   M-C-B-E-A-N, Deputy Commissioner.

16       DEPUTY DISTRICT ATTORNEY DELAVIGNE:  Jack

17   Delavigne, D-E-L-A-V-I-G-N-E, Deputy District

18   Attorney, L.A. County.

19       ATTORNEY RUTLEDGE:  Kateria E. Rutledge,

20   R-U-T-L-E-D-G-E, Attorney for Mr. Mijangos.

21       PRESIDING COMMISSIONER FISHER:  Go ahead.

22       INMATE MIJANGOS:  Jaime Mijangos,

23   M-I-J-A-N-G-O-S, CDC E-81550.

24       PRESIDING COMMISSIONER FISHER:

25   Ms. Rutledge, did you talk to Mr. Mijangos about

26   any ADA issues?

27       ATTORNEY RUTLEDGE:  Yes.  I don't think

3

1    knows of any, but he does have glasses, so his

2    ADA rights have been met.

3         **PRESIDING COMMISSIONER FISHER:** All

4    right. And I do want to know for the record

5    that on 8/9/04, Mr. Mijangos did sign a BPT 1073

6    form and stated that he has no disabilities. Is

7    that still right?

8         **INMATE MIJANGOS:** Yes.

9         **PRESIDING COMMISSIONER FISHER:** Okay, are

10   those reading glasses.

11        **INMATE MIJANGOS:** Yeah. No, I think it's

12   for --

13        **PRESIDING COMMISSIONER FISHER:** For

14   distance?

15        **PRESIDING COMMISSIONER FISHER:** All

16   right. Okay, this Hearing is being conducted

17   pursuant to Penal Code Sections 3041 and 3042,

18   and the Rules and Regulations of the Board of

19   Prison Terms that govern Parole Consideration

20   Hearings of and for life inmates. And, as you

21   know, the purpose of the Hearing today is to

22   consider your commitment offense, your prior

23   criminal and social history, and your behavior,

24   and your programming since you've been in prison

25   since this offense. We have had the opportunity

26   to review your files. I'm going to give you the

27   opportunity to make any corrections that you

4

1    need to today.  All right.  We are going to be

2    reaching a decision today whether or not we find

3    you suitable for parole.  If we do find you

4    suitable, I'll explain to you today what the

5    length of your confinement will be.  Prior to

6    recessing today, I'm going to give you and your

7    attorney, as well as the District Attorney, an

8    opportunity to make a final statement about your

9    suitability.  I want to remind you that you are

10   not required today to admit or discuss the

11   offense, but that the Panel accepts the Findings

12   of the Court to be true.  Do you understand

13   that?

14        **INMATE MIJANGOS:**  Yes.

15        **PRESIDING COMMISSIONER FISHER:**  Okay.

16   The California Code of Regulations states that

17   regardless of time served, a life inmate shall

18   be found unsuitable for and denied parole if, in

19   the judgment of the Panel, he would pose an

20   unreasonable risk of danger to society if

21   released from prison.  You have rights related

22   to your Hearing that include the right to a

23   timely notice of the Hearing, the right to

24   review your Central File, and the right to

25   present relevant documents.  Counselor, has your

26   client's rights been met?

27        **ATTORNEY RUTLEDGE:**  Yes.

5

1          PRESIDING COMMISSIONER FISHER:    All

2    right.    You also have the right, Mr. Mijangos,

3    to an impartial Panel.    Having seen your two

4    Panel members today, do you have any objection

5    to your Panel?

6          INMATE MIJANGOS:    No I don't.

7          PRESIDING COMMISSIONER FISHER:

8    Counselor, any objections to the Panel?

9          ATTORNEY RUTLEDGE:    None.

10         PRESIDING COMMISSIONER FISHER:    Okay.

11   I'm going to give you a written copy of our

12   decision.    It is going to be a tentative

13   decision.    It will be effective within 120 days.

14   And then a copy of the decision and a copy of

15   the transcript of the Hearing is going to be

16   sent to you.    Now, they changed the way that you

17   appeal Board decisions last year.    And now all

18   appeals go directly to the Courts.    So if you

19   need more information about that, your

20   correctional counselor should have it and it

21   also should be in the prison library.    Would you

22   pass that down for me, please.

23         DEPUTY COMMISSIONER McBEAN:    Uh huh.

24         PRESIDING COMMISSIONER FISHER:    Thanks.

25   Do you have them all?

26         DEPUTY DISTRICT ATTORNEY DELAVIGNE:    I

27   have them all, thank you.

6

1        PRESIDING COMMISSIONER FISHER:  Thanks.

2        ATTORNEY RUTLEDGE:  It's fine.

3        PRESIDING COMMISSIONER FISHER:

4  (indiscernible) office of direction, every time.

5        ATTORNEY RUTLEDGE:  A bad habit.

6        PRESIDING COMMISSIONER FISHER:  Is there

7  anything that needs to be submitted?

8        ATTORNEY RUTLEDGE:  No.  I would just

9  ask, did you receive any Certificates since the

10  last Hearing?  I don't see any in the file.

11        INMATE MIJANGOS:  No.  I'm not a student

12  but I'm still working with like computers

13  (indiscernible).

14        ATTORNEY RUTLEDGE:  Oh, wait, you've

15  completed --

16        INMATE MIJANGOS:  Yes.

17        ATTORNEY RUTLEDGE:  Accounting, okay.

18  That's fine.  (indiscernible).

19        INMATE MIJANGOS:  That's the one I

20  started working on, computer.

21        ATTORNEY RUTLEDGE:  Okay.

22        INMATE MIJANGOS:  I have certificates I

23  got them for the last time, the last Hearing.

24        PRESIDING COMMISSIONER FISHER:  Okay.

25  And as we go through things, when we go through

26  your post conviction factors, if there's

27  anything that is missing, you can let us know.

7

1   Okay.  All right.  Any preliminary objections?

2          ATTORNEY RUTLEDGE:  None.

3          PRESIDING COMMISSIONER FISHER:  Okay, is

4   Mr. Mijangos going to be speaking with us?

5          ATTORNEY RUTLEDGE:  Yes.

6          PRESIDING COMMISSIONER FISHER:  Okay.  If

7   you will raise your right hand, I'm going to

8   swear you in.  Do you solemnly swear or affirm

9   that the testimony you give at this Hearing will

10  be the truth, and nothing but the truth?

11         INMATE MIJANGOS:  Yes, I do.

12         PRESIDING COMMISSIONER FISHER:  All

13  right, thank you.  Okay.  What I'm going to do,

14  is read a summary of the crime into the record.

15  And then I'm going to ask you to tell me in your

16  own words if it's correct and kind of fill in

17  the gap a little bit.  And Counsel, I'm looking

18  at the Probation Officer's Report, do you have

19  any objections to that?

20         ATTORNEY RUTLEDGE:  I thought it was kind

21  of confusing.  The Board Report synopsis, I --

22         PRESIDING COMMISSIONER FISHER:  Is it a

23  better version?

24         ATTORNEY RUTLEDGE:  I think it's more

25  concise.  But if you want to use that one, it's

26  fine.

27         PRESIDING COMMISSIONER FISHER:  I'll just

8

1    use that one; that ones fine.    That is dated May

2    2001.    Under Summary of Crime it reads as

3    follows:

4            The defendant, his cousins and

5            several other people went to the

6            Pan American Club on the evening

7            of May 22, 1990, where they

8            remained until closing time.

9            Victims Salvador and Ulisas,

10           U-L-I-S-A-S, Chavez, who were

11           brothers, had gone to the club

12           that same evening but were denied

13           entrance since one of them did not

14           have identification.    The Chavez

15           bothers then left the location but

16           returned at closing time.    The

17           victim

18    And, I guess is it, Mr. Delavigne, do you know

19    is it Ulesas [phonetic], Ulisis [phonetic]?    I

20    don't know how to pronounce this guys name.

21        DEPUTY DISTRICT ATTORNEY DELAVIGNE:

22    Ulisas, it looks like to me.

23        PRESIDING COMMISSIONER FISHER:    Okay,

24    you're about as good at it as I am.    All right.

25           Mr. Chavez was waiting with

26           friends on the street, by a gas

27           station, when a car approached

9

1          containing two females and two

2          males.  They all exited the

3          vehicle and asked the victim if he

4          had seen who had broken into his

5          car.  The victim said that he did

6          not known, at which time the

7          person hit him with his fist and

8          kicked him in the groin.  At this

9          point, the victim's brother,

10         Salvador Chavez, came across the

11         street from the club to assist his

12         brother.  Apparently, the

13         defendant was nearby parking his

14         vehicle, when he saw victim

15         Salvador Chavez approaching the

16         location.  The defendant fired his

17         9-milimeter weapon, striking

18         Victim Salvador Chavez in the

19         chest, causing his death.  Then

20         shot at Victim Ulisas Chavez,

21         striking him in the right buttock,

22         hit area.

23         **PRESIDING COMMISSIONER FISHER:**  All

24  right, is that correct?

25         **INMATE MIJANGOS:**  (indiscernible).

26         **PRESIDING COMMISSIONER FISHER:**  Okay,

27  tell me what is correct.

10

1        INMATE MIJANGOS:  Once I got to the -- I

2   was ready to leave, when I got to the corner I

3   was going to turn and get the freeway, and

4   seeing where my cousin was parked, his car, and

5   I see a few guys approaching him.

6        PRESIDING COMMISSIONER FISHER:  Uh huh.

7        INMATE MIJANGOS:  So I turned and got

8   close to him.  When I was getting close to them

9   I see one of these guys hitting my cousin with a

10  beer bottle in the face and pushing and hitting

11  my aunt (indiscernible).

12       PRESIDING COMMISSIONER FISHER:  Hitting

13  your aunt?

14       INMATE MIJANGOS:  Yes.

15       PRESIDING COMMISSIONER FISHER:  Okay.

16       INMATE MIJANGOS:  (indiscernible), we

17  were celebrating her birthday.

18       PRESIDING COMMISSIONER FISHER:  Uh huh.

19       INMATE MIJANGOS:  So I got closer to them

20  and this guy who throwed the beer bottle at my

21  cousin's face, he got close to me, I was parked

22  already in the middle of the street, he started

23  coming towards me, and he started telling

24  (indiscernible).  At the same time he was

25  getting closure to me, he was reaching like he

26  was going to pull something out of his pants.

27       PRESIDING COMMISSIONER FISHER:  Uh huh.

11

1        INMATE MIJANGOS:  I got scared, had a 9-
2   milimeter in my car --

3        PRESIDING COMMISSIONER FISHER:  Uh huh.

4        INMATE MIJANGOS:  -- turned, I picked it
5   up, loaded it, and when I turned the gun went
6   off, that's when I shot him.

7        PRESIDING COMMISSIONER FISHER:  All
8   right, why did you have a gun in your car?

9        INMATE MIJANGOS:  Because the day before
10  that we went to -- I went with my friends to a
11  target shooting.

12       PRESIDING COMMISSIONER FISHER:  All
13  right, whose gun was it?  Whose gun was it?  Was
14  it your gun?

15       INMATE MIJANGOS:  Yes.

16       PRESIDING COMMISSIONER FISHER:  Okay.  So
17  you had been target shooting the day before,
18  right?

19       INMATE MIJANGOS:  Yes.

20       PRESIDING COMMISSIONER FISHER:  So you
21  obviously shot a gun before?

22       INMATE MIJANGOS:  Yes.

23       PRESIDING COMMISSIONER FISHER:  Explain
24  to me how the gun went off?

25       INMATE MIJANGOS:  I just turned, when I
26  turned I see a guy standing right there by my
27  window, (indiscernible) and it went off.

12

1      PRESIDING COMMISSIONER FISHER:  Why were

2  you holding it with your finger on the trigger?

3  You know how to handle a gun.

4      INMATE MIJANGOS:  I was scared.

5      PRESIDING COMMISSIONER FISHER:  If you

6  were sitting across from me and you had shot a

7  gun before, would the idea that somebody who

8  knew how to handle weapons would be in a

9  situation where the gun just went off.  Would

10  that sound reasonable to you?

11      INMATE MIJANGOS:  I ain't denying that I

12  shot him, because I shot him.

13      PRESIDING COMMISSIONER FISHER:  Well,

14  just saying, "that I shot him" and saying "the

15  gun went off and it was kind of an accident,"

16  are two different things.

17      INMATE MIJANGOS:  Well, at that moment,

18  it was something that (indiscernible) was

19  scared.

20      PRESIDING COMMISSIONER FISHER:  Okay.

21      INMATE MIJANGOS:  When I chose to turn,

22  the gun went off, I pulled the trigger

23  eventually, because I (indiscernible).

24      PRESIDING COMMISSIONER FISHER:  Okay.

25  All right, that whole the gun went off thing

26  just always kind of troubles me, especially when

27  I find out that somebody knows how to use the

13

1  gun.  All right, what else?  What happened after

2  you shot him?

3      INMATE MIJANGOS:  I see the other guy, I

4  think it was his brother, standing in the middle

5  of the street, so there was two guys standing in

6  front of my car, (indiscernible).  There was

7  another three guys by the sidewalk, two guys in

8  the middle of two cars, one guy (indiscernible).

9  I shot through the (indiscernible).  The guys

10  that were on the sidewalk, they took off

11  running.

12      PRESIDING COMMISSIONER FISHER:  Uh huh.

13      INMATE MIJANGOS:  The other guy, the two

14  guys that were in the middle of the street, one

15  took off running, the other one fell and stayed

16  there.

17      PRESIDING COMMISSIONER FISHER:  Okay, and

18  what did you do?  You said you shot through the

19  floor, is that what you said?

20  Okay.

21      INMATE MIJANGOS:  So my family got

22  into the car and (indiscernible).

23      PRESIDING COMMISSIONER FISHER:

24  Okay.

25      INMATE MIJANGOS:  And

26  (indiscernible) the other guy

27  (indiscernible) shot him was hit.

14

1        PRESIDING COMMISSIONER FISHER:  Okay, but

2    did you know that the one man was dead?

3        INMATE MIJANGOS:  Through the floor.

4        PRESIDING COMMISSIONER FISHER:  You shot

5    toward the ground?

6        INMATE MIJANGOS:  To the ground.

7        PRESIDING COMMISSIONER FISHER:  Okay,

8    what was the point of that, just to scare them

9    away?

10        INMATE MIJANGOS:  (indiscernible).

11        PRESIDING COMMISSIONER FISHER:

12        INMATE MIJANGOS:  I find out that

13    (indiscernible).

14        PRESIDING COMMISSIONER FISHER:  You saw

15    him fall, right?

16        INMATE MIJANGOS:  Yes.

17        PRESIDING COMMISSIONER FISHER:  When you

18    shot him.  Why didn't you call the police?

19        INMATE MIJANGOS:  Just (indiscernible)

20    got scared.  (indiscernible)

21        PRESIDING COMMISSIONER FISHER:  But you

22    weren't, I mean, if this is what happened you

23    weren't doing anything wrong, you were defending

24    yourself, right?

25        INMATE MIJANGOS:  I wasn't sure, I was

26    carrying.

27        PRESIDING COMMISSIONER FISHER:  Uh huh.

15

1        **PRESIDING COMMISSIONER FISHER:**  Was it --

2        **INMATE MIJANGOS:**  I shot a man.

3        **PRESIDING COMMISSIONER FISHER:**  Was it

4    not a legal gun?  Where did you get it?  Where

5    did you get the gun?

6        **INMATE MIJANGOS:**  Oh, I bought it.

7        **PRESIDING COMMISSIONER FISHER:**  From a

8    gun shop?

9        **INMATE MIJANGOS:**  Yes but I didn't have a

10   permit for the gun.

11       **PRESIDING COMMISSIONER FISHER:**  Didn't

12   have a permit.  How did you buy it without a

13   permit?  You have to register it.

14       **INMATE MIJANGOS:**  Back then you didn't

15   need a permit for a gun.  You just buy it on --

16       **PRESIDING COMMISSIONER FISHER:**

17   (indiscernible)

18       **PRESIDING COMMISSIONER FISHER:**  -- and

19   they give you about five days waiting.

20       **PRESIDING COMMISSIONER FISHER:**  Hum.

21       **INMATE MIJANGOS:**  Something like that.

22       **PRESIDING COMMISSIONER FISHER:**  Yeah, you

23   have to do like a seven days waiting period.  I

24   thought you had to register it, though, right?

25   I mean, I know you didn't, maybe you didn't have

26   a permit to carry a concealed weapon, but if you

27   bought the gun legally, and it was registered,

16

1   then it's not an illegal gun.

2        INMATE MIJANGOS:  (indiscernible) Well --

3        PRESIDING COMMISSIONER FISHER:  Never

4   mind, it's not important, I just trying to

5   figure out what you were thinking here.

6        DEPUTY COMMISSIONER McBEAN:  I think your

7   point was, if it wasn't an illegal weapon, why

8   didn't he call the police, right?

9        PRESIDING COMMISSIONER FISHER:  Exactly,

10  but apparently --

11       DEPUTY COMMISSIONER McBEAN:  Can you

12  answer that question?

13       INMATE MIJANGOS:  No.

14       PRESIDING COMMISSIONER FISHER:  I think -

15  -

16       INMATE MIJANGOS:  I didn't call the

17  police because I was scared.

18       DEPUTY COMMISSIONER McBEAN:  I know, but

19  beyond that, there's to, there's more behind

20  that you were scared.  Why else didn't you call

21  the police?

22       INMATE MIJANGOS:  Well, I can't answer.

23  All I can say is that I was scared and that's

24  why I took off.

25       PRESIDING COMMISSIONER FISHER:  Were you

26  a gang member?

27       INMATE MIJANGOS:  (indiscernible).

17

1    PRESIDING COMMISSIONER FISHER:  Yeah, and

2    I think what Commissioner McBean is kind of

3    alluding to, is that most law abiding citizens

4    who shot somebody in self-defense, when they

5    were being attacked, would call the police,

6    because they would think of themselves as the

7    victim in the case.  I'm just curious as to -- I

8    don't know, it's my impression from you answer

9    to me about the gun, that maybe you thought that

10   having the gun was illegal because you didn't

11   have a weapon, a concealed weapon permit.  Is

12   that what you were saying?  Is it --

13       INMATE MIJANGOS:  (indiscernible).

14       PRESIDING COMMISSIONER FISHER:  Because

15   you bought the gun legally, right?  You bought

16   the gun at a gun shop, so it's a legal weapon?

17       INMATE MIJANGOS:  The gun, I bought it, I

18   got it from a friend.

19       PRESIDING COMMISSIONER FISHER:  Oh, okay,

20   so you didn't buy it at a gun shop?

21       INMATE MIJANGOS:  No.

22       PRESIDING COMMISSIONER FISHER:  Okay.  So

23   you didn't do the waiting period?  You didn't

24   buy it at a gun shop, you didn't do the waiting

25   period, and it wasn't registered to you?

26       INMATE MIJANGOS:  No.

27       PRESIDING COMMISSIONER FISHER:  All

18

1   right.

2        INMATE MIJANGOS:  (indiscernible) waiting

3   period because I had a gun.  I mean, I know the

4   gun.

5        PRESIDING COMMISSIONER FISHER:  All

6   right, okay.  How did you get arrested for this

7   case?

8        INMATE MIJANGOS:  I think my wife called

9   the police, because I told her.

10        PRESIDING COMMISSIONER FISHER:  Because

11   you told her you had shot somebody.  I saw that

12   in the Probation Officer's Report, that you had

13   told her that you had shot somebody, that you

14   thought that you had killed somebody.

15        INMATE MIJANGOS:  Yes.

16        PRESIDING COMMISSIONER FISHER:  All

17   right.  And you didn't know these guys at all,

18   right?  You had never met them before?  Had

19   never seen them before or anything?

20        INMATE MIJANGOS:  No.

21        PRESIDING COMMISSIONER FISHER:  How old

22   was your aunt?

23        INMATE MIJANGOS:  Excuse me.

24        PRESIDING COMMISSIONER FISHER:  How old

25   was your aunt?

26        INMATE MIJANGOS:  Back then she was

27   around maybe 48.

19

1        **PRESIDING COMMISSIONER FISHER:**  Okay.

2        **INMATE MIJANGOS:**  She's passed away.

3        **PRESIDING COMMISSIONER FISHER:**  All

4  right.  Okay, is there anything else about, just

5  about what happened that evening, that you and I

6  haven't talked about that you think would be

7  important for us to know?

8        **INMATE MIJANGOS:**  (indiscernible).

9        **PRESIDING COMMISSIONER FISHER:**  All

10  right.  Let's talk about your prior history,

11  before you came to prison for this crime.  Let

12  me see here.  I'll double check on this real

13  quick.  It seems like I saw a prior arrest.

14  Yeah, here it is.  In 1986, you were arrested

15  for corporal injury to a spouse, but I don't

16  show a disposition on that.  What happened?

17        **INMATE MIJANGOS:**  That day I got into an

18  argument with my wife.

19        **PRESIDING COMMISSIONER FISHER:**  Uh huh.

20        **INMATE MIJANGOS:**  And I strike her and

21  she called the cops and I got arrested.

22        **PRESIDING COMMISSIONER FISHER:**  Okay, and

23  then what happened?  After you got arrested,

24  what happened?  Anything?  Did you --

25        **INMATE MIJANGOS:**  Bailed out, went to

26  Court.  The charges were dropped.

27        **PRESIDING COMMISSIONER FISHER:**  Okay,

20

1    because your wife, your wife wouldn't testify?

2            INMATE MIJANGOS:  Well, she didn't make

3    any --

4            PRESIDING COMMISSIONER FISHER:  She

5    didn't press --

6            INMATE MIJANGOS:  She didn't

7    (indiscernible).

8            PRESIDING COMMISSIONER FISHER:  -- she

9    didn't make a complaint.

10           INMATE MIJANGOS:  Yeah, because

11   (indiscernible).

12           PRESIDING COMMISSIONER FISHER:  Okay.

13           INMATE MIJANGOS:  That's something that I

14   regret.  I have asked her for forgiveness

15   (indiscernible).

16           PRESIDING COMMISSIONER FISHER:  Okay.

17   Had you ever hit her before?

18           INMATE MIJANGOS:  Just that time.

19           PRESIDING COMMISSIONER FISHER:  Just that

20   time?  That was the only time?

21                (no audible response)

22           PRESIDING COMMISSIONER FISHER:  Okay.

23   Why do you think -- why did she call the police?

24   Why did she call the police?  Why didn't she ask

25   you to call the police?

26           INMATE MIJANGOS:  I don't know.

27           PRESIDING COMMISSIONER FISHER:  You don't

21

1  know.  You haven't asked her?

2          INMATE MIJANGOS:  I -- no.

3  (indiscernible).

4          PRESIDING COMMISSIONER FISHER:  Okay.

5  All right, let's move on.  Let's see here.

6  Okay, I'm just going to tell you what I have in

7  the file here as far as information about your

8  history.  It says that you were born in

9  Guatemala, is that correct?

10          INMATE MIJANGOS:  Yes.

11          PRESIDING COMMISSIONER FISHER:  And you

12  are the oldest of four?

13          INMATE MIJANGOS:  No, three.

14          PRESIDING COMMISSIONER FISHER:  Three?

15          INMATE MIJANGOS:  I have two sisters on

16  my father's side, and one sister on my mother's

17  side.

18          PRESIDING COMMISSIONER FISHER:  Okay, so

19  that would be four of you.

20          INMATE MIJANGOS:  (indiscernible).

21          PRESIDING COMMISSIONER FISHER:  You're

22  the only brother, huh?

23          INMATE MIJANGOS:  Yes, I am.

24          PRESIDING COMMISSIONER FISHER:  Okay.

25  Are they older than you?  I mean, all younger

26  than you?

27          INMATE MIJANGOS:  Yes.

22

1          PRESIDING COMMISSIONER FISHER:  Okay.

2   Let see, you came to the U.S. when you were 15.

3   Is that right?

4          INMATE MIJANGOS:  Yes.

5          PRESIDING COMMISSIONER FISHER:  Okay.

6   Why did you come here?

7          INMATE MIJANGOS:  My aunt brought me

8   here.

9          PRESIDING COMMISSIONER FISHER:  Why?

10         INMATE MIJANGOS:  To better our life.

11         PRESIDING COMMISSIONER FISHER:  Okay,

12  because I wondered that, because apparently you

13  went to school here but then you dropped out

14  when you were in the 11th grade.

15         INMATE MIJANGOS:  I was an 11 grader.  I

16  was 17.

17         PRESIDING COMMISSIONER FISHER:  Uh huh.

18         INMATE MIJANGOS:  And I dropped out to

19  start working to help my father.

20         PRESIDING COMMISSIONER FISHER:  Okay.

21         INMATE MIJANGOS:  Family.

22         PRESIDING COMMISSIONER FISHER:  Okay.

23  And then when did the rest of your family come

24  here, to the U.S.?  Had you been here for a

25  while?  You don't have to be real specific.

26         INMATE MIJANGOS:  (indiscernible)

27         PRESIDING COMMISSIONER FISHER:  I'm just

23

1  trying to get a general idea.

2      INMATE MIJANGOS:  I was -- my mother

3  (indiscernible) she came back in '84.

4      PRESIDING COMMISSIONER FISHER:  Uh huh.

5      INMATE MIJANGOS:  My dad in '85.

6      PRESIDING COMMISSIONER FISHER:  And are

7  your sisters -- your sisters are all living --

8      INMATE MIJANGOS:  No.

9      PRESIDING COMMISSIONER FISHER:  -- here

10  now, right?

11      INMATE MIJANGOS:  Yes, one of my sisters

12  was born here on my mother's side, because my

13  mother used to live in New York.

14      PRESIDING COMMISSIONER FISHER:  Uh huh.

15      INMATE MIJANGOS:  Way back.  So she's a

16  citizen.

17      PRESIDING COMMISSIONER FISHER:  Citizen.

18      INMATE MIJANGOS:  And my two sisters came

19  up in '94 or '95.

20      PRESIDING COMMISSIONER FISHER:  Okay, and

21  your mom passed away --

22      INMATE MIJANGOS:  In '84, '85.

23      PRESIDING COMMISSIONER FISHER:  Okay, you

24  mom passed away in '84.  Is that right?

25      INMATE MIJANGOS:  Yes, she did.

26      PRESIDING COMMISSIONER FISHER:  Okay.

27  Now the report that I'm looking at is back from

24

1    2001, so I would just want to ask you, is your

2    dad still alive?  He was at the time of this

3    report.

4          INMATE MIJANGOS:  Yes, he is.

5          PRESIDING COMMISSIONER FISHER:  Okay, and

6    he's still in L.A.?

7          INMATE MIJANGOS:  Yes.

8          PRESIDING COMMISSIONER FISHER:  What

9    about your sisters, are they all still alive?

10         INMATE MIJANGOS:  Yes.

11         PRESIDING COMMISSIONER FISHER:  And are

12   you still in contact with them?

13         INMATE MIJANGOS:  Yes.

14         PRESIDING COMMISSIONER FISHER:  Okay.

15   Let's see here, it says that you're -- are you

16   still married?

17         INMATE MIJANGOS:  Yes.

18         PRESIDING COMMISSIONER FISHER:  And to

19   the same wife that you were married to at the

20   time of offense?

21         INMATE MIJANGOS:  Yes (indiscernible).

22         PRESIDING COMMISSIONER FISHER:  And the

23   two of you have two children, right?

24         INMATE MIJANGOS:  Three.

25         PRESIDING COMMISSIONER FISHER:  Three?

26   Okay.  How many boys?  How many girls?

27         INMATE MIJANGOS:  Two boys and one girl.

25

1       PRESIDING COMMISSIONER FISHER:  And how

2  are they doing?

3       INMATE MIJANGOS:  (indiscernible).

4       PRESIDING COMMISSIONER FISHER:  Good, all

5  right.  Are you in pretty constant contact with

6  your wife and kids?

7       INMATE MIJANGOS:  Yes.  I call them

8  (indiscernible) almost every week.

9       PRESIDING COMMISSIONER FISHER:  Okay,

10  good.  All right, regarding substance abuse, it

11  says that you really haven't had much of an

12  issue with any kind of substances.  That you

13  drank socially, things like at parties or on

14  holidays.  Does that sound right?

15       INMATE MIJANGOS:  Yes.

16       PRESIDING COMMISSIONER FISHER:  Okay, no

17  drugs at all?

18       INMATE MIJANGOS:  No.

19       PRESIDING COMMISSIONER FISHER:  Okay.  Is

20  there anything about your life before you came

21  to prison for this offense that you and I

22  haven't talked about that you think that we

23  should know about you?

24       INMATE MIJANGOS:  No.

25       PRESIDING COMMISSIONER FISHER:  Have we

26  covered it?

27             (no audible response)

26

1      PRESIDING COMMISSIONER FISHER:  Okay,

2  let's talk about your parole plans.  The current

3  Board Report refers me back to the 2001 Board

4  Report, so I'm going to tell you what it says

5  there and you can let me know if it is still

6  correct.  It says, "that you would live with

7  your wife in L.A.  And that after you are

8  released that you plan to move from, move out of

9  California, it doesn't really say where to, but

10  that you want to move out of California.  Is

11  that still correct?

12      INMATE MIJANGOS:  Well, my wife's staying

13  right now in Texas.

14      PRESIDING COMMISSIONER FISHER:  Uh huh.

15      INMATE MIJANGOS:  And I'm planning to

16  move to Texas.

17      PRESIDING COMMISSIONER FISHER:  Okay, so

18  you would move back, you would initially move

19  somewhere in California, or would you apply to

20  have your parole transferred before you even --

21      INMATE MIJANGOS:  I believe that if I

22  parole, I'm going to be paroled to L.A.

23      PRESIDING COMMISSIONER FISHER:  Uh huh.

24      INMATE MIJANGOS:  So I'm not sure how it

25  work.  But I think you have to spend some time,

26  a year or two years, I don't know how many

27  years, and you can asked your Parole Officer --

27

1          PRESIDING COMMISSIONER FISHER:   To be --

2          INMATE MIJANGOS:   -- Paroled somewhere

3     else.

4          PRESIDING COMMISSIONER FISHER:   And I'm

5     not sure exactly what the logistics of it are.

6          INMATE MIJANGOS:   (indiscernible) how it

7     work.

8          PRESIDING COMMISSIONER FISHER:   Okay.

9          INMATE MIJANGOS:   But my plans is what my

10    wife is in Texas so I have to be with my family.

11         PRESIDING COMMISSIONER FISHER:   Okay,

12    that makes sense.  And it says, that prior to

13    incarceration you were employed at Cal Tex

14    Plastics.  And it talks about the different

15    certifications that you have gotten while you've

16    been in prison.  It says, "Robert

17    (indiscernible), who is self-employed in the

18    construction field has indicated his desire to

19    offer you employment."  Who is he?  Is he a

20    friend?

21         INMATE MIJANGOS:   Yes, he is.

22         PRESIDING COMMISSIONER FISHER:   Let's see

23    here.  It says here that you are an amnesty

24    applicant and that you are not deportable at

25    this time.  So there is no INS hold in place.

26    Is that correct?

27                (no audible response)

28

1          **PRESIDING COMMISSIONER FISHER:**  Okay.

2    Let's see here.  I've got some letters of

3    support for you.  The first letter is from the

4    teacher in Vocational Computer Refurbishing, and

5    this looks like a chrono, so I'm going to let

6    Commissioner McBean go over that when she does

7    your post-conviction factors.  I have a letter

8    here from someone named Ivan, is that your dad?

9    I mean you son?

10          **INMATE MIJANGOS:**  It's my son.

11          **PRESIDING COMMISSIONER FISHER:**  Okay.

12          **INMATE MIJANGOS:**  It's my son.

13          **PRESIDING COMMISSIONER FISHER:**  All

14   right, he talks about not having you in your

15   life.

16          **INMATE MIJANGOS:**  That letter

17   (indiscernible).

18          **PRESIDING COMMISSIONER FISHER:**  I think

19   it's cute.

20          **INMATE MIJANGOS:**  Yeah, my counselor told

21   me, "You want me to pull that letter out?"  I

22   said, "No, it's just what he feels."

23          **PRESIDING COMMISSIONER FISHER:**  He's

24   talking about all the stuff he missed not having

25   you there.

26          **INMATE MIJANGOS:**  Yes.

27          **PRESIDING COMMISSIONER FISHER:**  That's

29

1    all it is.  He says that he doesn't really know

2    much about you because, it says, "When we visit

3    we usually talk about what I've done and what is

4    new at home."  Let's see here, I have one here

5    from Pastor Carlos Calderon [phonetic], whose

6    he?

7            INMATE MIJANGOS:  My (indiscernible).

8            PRESIDING COMMISSIONER FISHER:  Okay.  He

9    talks about knowing you since you were a small

10    boy.  And this is just generally supportive.

11    He's just saying why he believes that you should

12    be paroled.  Michelle Calderon, is that --

13            INMATE MIJANGOS:  Michelle, that's my

14    cousin.

15            PRESIDING COMMISSIONER FISHER:  Your

16    cousin, right.  Same thing, just very

17    supportive.

18            INMATE MIJANGOS:  It's (indiscernible)

19    but they live in (indiscernible) --

20            PRESIDING COMMISSIONER FISHER:  Virginia.

21            INMATE MIJANGOS:  -- Washington.

22            PRESIDING COMMISSIONER FISHER:  Virginia.

23            INMATE MIJANGOS:  Excuse me?

24            PRESIDING COMMISSIONER FISHER:  Virginia.

25            INMATE MIJANGOS:  Virginia.

26            PRESIDING COMMISSIONER FISHER:  Which is

27    right across, right across the street,

30

1   basically, from Washington, D.C.

2   **INMATE MIJANGOS:**  Yeah.

3   **PRESIDING COMMISSIONER FISHER:**  Okay.

4   And I have one here from your sister.  She says,

5   "My husband, Carlos and I are more than willing

6   to have Jaime come and live with us here in

7   Virginia.  We want to help him find a job and

8   are more than willing to give him a place to

9   live and the necessities to start a new life."

10  And I have some others that are (indiscernible),

11  Madrono [phonetic].  I have a couple

12  (indiscernible) for kids.  Let's see here, one

13  Carlos Inga [phonetic], this is your brother-in-

14  law, right?

15  **INMATE MIJANGOS:**  Yes, he's married to my

16  sister, who lives in Virginia.

17  **PRESIDING COMMISSIONER FISHER:**  Virginia.

18  He says, "My wife and I would be more than happy

19  to help Jaime find a job, provide him with

20  necessities to start over.  We feel that he

21  would be happy and glad to come and live with

22  us, as we are starting our own little family."

23  This is from Maria Cano, C-A-N-O, this one, is

24  once again, is just general supportive.  Anna

25  Garcia, same thing.  (indiscernible) Gonzales.

26  I have one from your father.  Let's see here.

27  He says, let's see here, "Upon his release he

31

1    will be living with me.  I'm single and I live

2    alone."  And he gives the address.  "I will take

3    care of his needs, that is emotionally as well

4    as financially.  We also have many members of

5    the family that have offered to be by our side

6    to help Jaime (indiscernible) readjust."  I have

7    one here from your mother-in-law.  She says,

8    "Jaime will have our support with housing,

9    clothing, car, money.  We will help him get back

10   in society so he can finish taking care of his

11   kids."  I have one from Sylvia Rodriguez who's

12   saying, "I can provide housing to him because

13   he's a good person."  This is your sister-in-

14   law?  Sylvia Rodriguez?

15          **INMATE MIJANGOS:**  Yes.

16          **PRESIDING COMMISSIONER FISHER:**  Okay.

17   And I think that's everything that I have.  Is

18   there anything else that I should have regarding

19   your parole plans?  Or did we cover it?

20          **INMATE MIJANGOS:**  I (indiscernible).

21          **PRESIDING COMMISSIONER FISHER:**  Okay, all

22   right, if that's everything.  If you will, oh,

23   one more thing, I'll just tell you, we received

24   -- the Board sends out something called 3042

25   Notices.  They go out to any agencies that are

26   interested in your parole status.  And we

27   received a letter back from the Los Angeles

32

1  Police Department, and I'm going to read it to

2  you.  It says:

3          Jaime Mijangos is a known 18th

4          Street Gang member.  The

5          commitment offense was carried out

6          in a manner, which exhibited a

7          callous disregard for the life or

8          suffering of another.  The motive

9          for the crime was very trivial in

10          relation to the offense and it

11          involved multiple victims.  He

12          murdered one victim and attempted

13          to murder another by shooting them

14          with a firearm after a verbal

15          argument.  We recommend that his

16          parole be denied.  It is the

17          Department's position to adamantly

18          oppose the release of this inmate

19          back into the community.

20  Do you want to respond to the fact that they say

21  that you are an 18th Street Gang member?  Do you

22  know where that came from?

23          **INMATE MIJANGOS:**  No.

24          **PRESIDING COMMISSIONER FISHER:**  Okay.

25          **INMATE MIJANGOS:**  The only time when it

26  appears about the 18th Street Gang on my files

27  is because the victims they claimed to be 18th

33

1   Street Gang members.

2          INMATE MIJANGOS:   They said they are?

3   The victims are?

4          INMATE MIJANGOS:   Well --

5          PRESIDING COMMISSIONER FISHER:   Or they

6   said that you are?

7          INMATE MIJANGOS:   No, no, no.   That the

8   night that the crime happens, I mean, they claim

9   to be 18th Street Gang.

10         PRESIDING COMMISSIONER FISHER:   All

11  right, so the victim said that they were 18th

12  Street Gang.

13         INMATE MIJANGOS:   Yes.

14         PRESIDING COMMISSIONER FISHER:   Okay, so

15  maybe that's where they pulled it from.   All

16  right.   Then if

17         INMATE MIJANGOS:   (indiscernible)

18         PRESIDING COMMISSIONER FISHER:   Go ahead.

19         INMATE MIJANGOS:   I think they should

20  have records of me, I don't know (indiscernible)

21  saying that I'm known for being 18th Street

22  Gang.   I've never been in no gang and I probably

23  never will.

24         PRESIDING COMMISSIONER FISHER:   Okay.

25  All right.   Well, it's not the first time that

26  they've made a mistake in their letters.   I

27  haven't seen anything in the file.   If I see, if

34

1    I come across anything in the file that

2    indicates that you were a gang member or if

3    Mr. Delavigne has anything that indicates that

4    you were a gang member, we'll talk about that,

5    as the Hearing goes on.  In the meantime, if you

6    will turn your attention to Commissioner McBean,

7    she's going to go through your post-conviction

8    factors.

9         **DEPUTY COMMISSIONER McBEAN:**  Okay,

10   Mr. Mijangos, in this phase of the Hearing we

11   will be looking at your institutional

12   adjustment.  I have reviewed the Central File,

13   the Board Report, the psych evaluation.  If I

14   miss anything, I'll be giving you and your

15   attorney an opportunity to add some things.  I

16   see that you last appeared before the Board on

17   10/17/01, that was your Initial Parole

18   Consideration Hearing.  At that time you were

19   given a three-year denial.  You were asked to

20   remain disciplinary free, to upgrade

21   vocationally and educationally and to

22   participate in self-help and therapy.  You have

23   a current classification score of 19.  Your

24   custody level is Medium A.  Are you still

25   working for the computer technologies?

26        **INMATE MIJANGOS:**  Yes, I am.

27        **DEPUTY COMMISSIONER McBEAN:**  Is that

1    computer repair?

2         INMATE MIJANGOS:  Yes, it is.

3         DEPUTY COMMISSIONER McBEAN:  Or

4    refurbishing?

5         INMATE MIJANGOS:  It used to be.  We used

6    to fix computers for the schools but they closed

7    that.  So now it's a class.

8         DEPUTY COMMISSIONER McBEAN:  Okay, in

9    Computer Technology then?

10        INMATE MIJANGOS:  Yes.

11        DEPUTY COMMISSIONER McBEAN:  Okay.  And

12   you've been there since April '04 and are doing

13   very well there, exceptionally well, according

14   to work reports.  You have a GED.  You acquired

15   that in '94, right?

16        INMATE MIJANGOS:  Yes.

17        DEPUTY COMMISSIONER McBEAN:  And the last

18   TABE score I saw was 7.8.  From a vocational

19   standpoint you've completed two vocational

20   programs:  Office Services, back in '94; and

21   Data Processing in '01.  Is that right?

22        INMATE MIJANGOS:  Yes.

23        DEPUTY COMMISSIONER McBEAN:  Computer

24   Repair or Technologies, is that a vocational

25   area? Or a job assignment? Or education? Or

26   what?

27        INMATE MIJANGOS:  Well, that's, well, I

36

1  don't, I'm like I work, I'm at work program.

2      DEPUTY COMMISSIONER McBEAN:  Oh, all

3  right.

4      INMATE MIJANGOS:  But it is a vocational,

5  they have students.

6      DEPUTY COMMISSIONER McBEAN:  I see, but

7  for you it's a job assignment?

8      INMATE MIJANGOS:  Yes.

9      DEPUTY COMMISSIONER McBEAN:  Okay.  What

10  are you doing for them?

11      INMATE MIJANGOS:  I help the new students

12  how to fix computers, take them apart, put them

13  back together.  Just explain about the hard

14  drives and so forth.

15      DEPUTY COMMISSIONER McBEAN:  Okay, and

16  where did you learn that?

17      INMATE MIJANGOS:  In here.

18      DEPUTY COMMISSIONER McBEAN:  So did you

19  take a computer program course that taught you

20  all that?

21      INMATE MIJANGOS:  When I start back in

22  2000, I think, I start in the (indiscernible),

23  so they moved me to the CET.  So I started

24  working and learning then.  They closed that

25  shop, they reopened couple of years later and

26  they called me back as a work.  So that's how I

27  learned about it.

37

1          **DEPUTY COMMISSIONER McBEAN:**  All right,

2   so you have work skills there but you didn't

3   actually complete a voc program.

4          **INMATE MIJANGOS:**  No.

5          **DEPUTY COMMISSIONER McBEAN:**  All right.

6   Also, you've taken some classes in: Information

7   Technologies; Business Applications;

8   Salesmanship, although that was through the

9   Muslim Center, I didn't understand that.

10         **INMATE MIJANGOS:**  (indiscernible), yes.

11         **DEPUTY COMMISSIONER McBEAN:**  Through the

12  Muslim Center?

13         **INMATE MIJANGOS:**  Yes, Muslim Center.

14         **DEPUTY COMMISSIONER McBEAN:**  So it's not

15  through the Education Department?

16         **INMATE MIJANGOS:**  No.

17         **DEPUTY COMMISSIONER McBEAN:**  Okay.  How

18  about Business Applications, is that through

19  Education or through the Muslim Center?

20         **INMATE MIJANGOS:**  I think that was

21  through the Muslim Center.

22         **DEPUTY COMMISSIONER McBEAN:**  Muslim

23  Center, too.  Okay.  All right, any other self-

24  help, excuse me, any other vocational trades

25  that you have completed, besides the Office

26  Services and Data Processing?

27         **INMATE MIJANGOS:**  I think I have one.

38

1  Probably you don't have the copy right there for

2  Accounting.

3        DEPUTY COMMISSIONER McBEAN:  Accounting?

4        INMATE MIJANGOS:  Yes.

5        DEPUTY COMMISSIONER McBEAN:  Is that a

6  vocational program?

7        INMATE MIJANGOS:  No.  It wasn't no

8  vocational program, it was like a --

9        DEPUTY COMMISSIONER McBEAN:  Class?

10        INMATE MIJANGOS:  Yeah, they give you,

11  they give you the book in the class.

12  (indiscernible) they give you the book and the

13  quiz and everything.

14        DEPUTY COMMISSIONER McBEAN:  So it was a

15  self-study program?

16        INMATE MIJANGOS:  Self-study, self-study.

17        DEPUTY COMMISSIONER McBEAN:  Through the

18  Education Department?

19        INMATE MIJANGOS:  Yes.

20        DEPUTY COMMISSIONER McBEAN:  Okay, you

21  took one accounting class, or what?

22        INMATE MIJANGOS:  Yes, one book.  One

23  semester.

24        DEPUTY COMMISSIONER McBEAN:  When was

25  that?  Approximately

26        INMATE MI?JANGOS:  About '99.  '99 or

27  2000.

39

1          DEPUTY COMMISSIONER McBEAN:  All right.

2    Anything else in terms of vocations?

3          INMATE MIJANGOS:  No, not that I

4    remember.

5          DEPUTY COMMISSIONER McBEAN:  All right,

6    that's fine.  If you think of something let me

7    know.  From a self-help standpoint, the file

8    indicates that you were drinking on the night of

9    the incident offense.  Is that correct?

10          INMATE MIJANGOS:  Yes.

11          DEPUTY COMMISSIONER McBEAN:  And what

12    drugs have you used in the past?

13          INMATE MIJANGOS:  I used drugs when I was

14    in high school.

15          DEPUTY COMMISSIONER McBEAN:  What was it?

16          INMATE MIJANGOS:  Marijuana, I think, I

17    just tried it.

18          DEPUTY COMMISSIONER McBEAN:  Uh huh.

19    Anything else?

20          INMATE MIJANGOS:  No.

21          DEPUTY COMMISSIONER McBEAN:  Okay, the

22    file indicates that you first started using

23    alcohol and drugs around the age of 17.  Is that

24    right?

25          INMATE MIJANGOS:  Excuse me?

26          DEPUTY COMMISSIONER McBEAN:  The file

27    indicates that you -- you stated that you first

40

1  started using alcohol and drugs of 17 --

2         INMATE MIJANGOS:  (indiscernible) said

3  that.  That's (indiscernible) I said.  I said

4  that I tried drugs when I was in high school.

5         DEPUTY COMMISSIONER McBEAN:  Uh huh.

6         INMATE MIJANGOS:  (indiscernible) they

7  make it sound like I've been doing it since 17.

8         DEPUTY COMMISSIONER McBEAN:  That's why

9  I'm asking you.

10         INMATE MIJANGOS:  (indiscernible).

11         DEPUTY COMMISSIONER McBEAN:  I was giving

12  you a chance to tell me what you used and how

13  frequently and all that.

14         INMATE MIJANGOS:  Well, I don't use drugs

15  at all.

16         DEPUTY COMMISSIONER McBEAN:  Okay, so you

17  were experimenting with marijuana in high

18  school?

19         INMATE MIJANGOS:  In high school.

20         DEPUTY COMMISSIONER McBEAN:  Okay.  And

21  you started drinking alcohol in high school.

22         INMATE MIJANGOS:  I started drinking in

23  high school, yes.

24         DEPUTY COMMISSIONER McBEAN:  Okay, all

25  right.  Now, from a self-help standpoint, I saw

26  that you participated in AA in '03, '04, and

27  '05.  Is that right?

41

1          INMATE MIJANGOS:    (indiscernible), yes,

2    I'm in --

3          DEPUTY COMMISSIONER McBEAN:    Alcoholics

4    Anonymous.

5          INMATE MIJANGOS:    AA, alcoholic.  But

6    what (indiscernible) was?

7          DEPUTY COMMISSIONER McBEAN:    2003, 2004,

8    2005.

9          INMATE MIJANGOS:    Oh, okay, the years.

10          DEPUTY COMMISSIONER McBEAN:    Yes, I was

11    going over the years.

12          INMATE MIJANGOS:    Yes, starting from

13    2000.

14          DEPUTY COMMISSIONER McBEAN:    I think he

15    started in 2002.

16          INMATE MIJANGOS:    (indiscernible) 2002.

17          DEPUTY COMMISSIONER McBEAN:    Yeah, I went

18    back through them and it looks like 2003

19    forward.  Are you still participating?

20          INMATE MIJANGOS:    Yes, I am.

21          DEPUTY COMMISSIONER McBEAN:    Okay, and

22    you also did some of the courses in terms of

23    health, sexually transmitted diseases, HIV and

24    TB prevention in '04.  You did a Maricanan

25    [phonetic] Program, and a Life Skills Program.

26    Is that right?

27          INMATE MIJANGOS:    Yes.

42

1      **DEPUTY COMMISSIONER McBEAN:**  Okay, any

2  other self-help that you've participated in?

3      **INMATE MIJANGOS:**  No.

4      **DEPUTY COMMISSIONER McBEAN:**  From a

5  disciplinary standpoint you have only one 115

6  and that was in 1992.  So the good news is that

7  you only have one and it was a long time ago.

8  The bad news is, is was for alcohol.

9      **INMATE MIJANGOS:**  Yes.

10     **DEPUTY COMMISSIONER McBEAN:**  And there

11 was some pruno found inside your cell.  Was that

12 your pruno?

13     **INMATE MIJANGOS:**  Well, --

14     **DEPUTY COMMISSIONER McBEAN:**  Half-a-

15 gallon.

16     **INMATE MIJANGOS:**  I guess.  They find it

17 in my cell.

18     **DEPUTY COMMISSIONER McBEAN:**  I know.  But

19 was it your pruno?  That was the question.

20     **INMATE MIJANGOS:**  Yes.

21     **DEPUTY COMMISSIONER McBEAN:**  Okay, that's

22 fine.  I would assume it was, it was in your

23 cell.

24     **INMATE MIJANGOS:**  (indiscernible) well,

25 it was in my cell but that doesn't mean -- you

26 sometimes doesn't make up the (indiscernible).

27     **DEPUTY COMMISSIONER McBEAN:**  Did you make

43

1    up the pruno?

2           INMATE MIJANGOS:  No.

3           DEPUTY COMMISSIONER McBEAN:  Oh, okay.

4    Did you have a celli?

5           INMATE MIJANGOS:  Yes.

6           DEPUTY COMMISSIONER McBEAN:  Did he make

7    the pruno?  I mean you don't have to tell me his

8    name.  Just yes or no.

9           INMATE MIJANGOS:  Yes.

10          DEPUTY COMMISSIONER McBEAN:  Okay.  And

11   were you drinking it?

12          INMATE MIJANGOS:  No.

13          DEPUTY COMMISSIONER McBEAN:  Selling it?

14          INMATE MIJANGOS:  No.

15          DEPUTY COMMISSIONER McBEAN:  Did you know

16   it was there?

17          INMATE MIJANGOS:  I knew it was there.

18          DEPUTY COMMISSIONER McBEAN:  Okay.  All

19   right, so, it wasn't your pruno.  That's your

20   testimony today.  Although at the Hearing you

21   said it was yours and you had two cups for New

22   Years.

23          INMATE MIJANGOS:  No, because --

24          DEPUTY COMMISSIONER McBEAN:  Rios didn't

25   know I had it.

26          INMATE MIJANGOS:  What?

27          DEPUTY COMMISSIONER McBEAN:  Your celli

44

1   didn't know you had it.  That was a statement

2   that you made at the 115 Hearing.  Rios,

3   R-I-O-S, was he your celli?

4        INMATE MIJANGOS:  Yeah, I guess so, he

5   was.

6        DEPUTY COMMISSIONER McBEAN:  Here's what

7   you said at the Hearing, "The pruno that was

8   found was mine.  I only had two cups for myself

9   for the New Year.  My celli, inmate Rios, didn't

10  know I had it."  So which one is true?  It was

11  yours and you drank it?  Or it wasn't your and

12  you didn't drink it?

13       INMATE MIJANGOS:  I didn't drink it but

14  it was in my cell, so that would make it mine.

15       DEPUTY COMMISSIONER McBEAN:

16  Mr. Mijangos, wait a second.  We're not playing

17  games here.  I'm just trying to ask you to tell

18  me what is true.  So I can see that there is a

19  115 here, it was a long time ago.  I can see

20  that it was in your cell.  I already know all

21  that.  Now, we are talking about what is really

22  true.  You said one thing then, you're saying

23  another thing now.  This is simply an

24  opportunity to tell me which one is true.  It's

25  not through deduction, it's a question of what's

26  true.  So which one is it?

27       INMATE MIJANGOS:  The pruno was in my

45

1  cell.

2      **DEPUTY COMMISSIONER McBEAN:**   Did you make

3  the pruno?

4      **INMATE MIJANGOS:**   No.

5      **DEPUTY COMMISSIONER McBEAN:**   Okay.   Did

6  it belong to you?

7      **INMATE MIJANGOS:**   It was in my cell so I

8  don't know how can you say it belongs to me.

9      **DEPUTY COMMISSIONER McBEAN:**   Okay.

10      **INMATE MIJANGOS:**   I mean --

11      **DEPUTY COMMISSIONER McBEAN:**   I can't get

12  a straight answer from you today.  You have an

13  opportunity to clarify something that you are

14  not willing to clarify.  So that's okay with me.

15  We can move on.  But I'm pointing out to you

16  that I'm not getting any straight answers from

17  you on that score.  And it's not worth lying

18  about, it was a long time ago.  Let's look at

19  the 128.  You have four 128s, the last one being

20  2/28/98, for -- well, actually, there was one on

21  2/24/05.  I guess you have five 128s.  And this

22  one is for failing to respond to a ducket for a

23  TABE test.  Do you need to take a TABE test when

24  you have a GED?

25      **INMATE MIJANGOS:**   That 128 is supposed to

26  be pulled out from my file.  And even my

27  (indiscernible) told me that they were going to

46

1  pull the 128 because I have my GED I didn't

2  (indiscernible).

3        DEPUTY COMMISSIONER McBEAN:   Okay.

4        INMATE MIJANGOS:  But then, excuse me --

5        DEPUTY COMMISSIONER McBEAN:  I'm sorry.

6        INMATE MIJANGOS:  Even the that they

7  ruled me a 128 (indiscernible) last

8  (indiscernible) took my TABE test.  That was

9  almost about the same day.

10        DEPUTY COMMISSIONER McBEAN:  Uh huh,

11  okay.  Well, that makes sense actually.  It

12  doesn't seem like you would have to take the

13  TABE test if you have a GED verified in the

14  file.  So the one before that was February 28,

15  '98, and that was for failing to report.

16        INMATE MIJANGOS:  It was?

17        DEPUTY COMMISSIONER McBEAN:  Uh huh.  So

18  your testimony today is that you've never been a

19  member of a gang?

20        INMATE MIJANGOS:  No.

21        DEPUTY COMMISSIONER McBEAN:  You're not

22  part of the 18th Street Gang?

23        INMATE MIJANGOS:  No.

24        DEPUTY COMMISSIONER McBEAN:  Okay.  The

25  A12 doesn't indicate that you are.  And I don't

26  see any indication in the file that you are. I

27  don't see any 115s indicating that you are, in

47

1    the Central File.  But I did see the same letter

2    indicating that you were part of the gang.  Now

3    let's look at your psych evaluation.  4/16/01,

4    is your last psych evaluation, excuse me 4/6/01.

5    Well, it has both those dates on it.  So we'll

6    go with 4/16, that's the date at the bottom.

7    This is by Dr. William Gamard, G-A-M-A-R-D, and

8    he gives you no contributory clinical disorder

9    on Axis I and II.  In terms of an assessment of

10   dangerousness, he said, "you received only one

11   115 during his entire incarceration, for

12   possession of inmate manufactured alcohol, in

13   December of '92, which he admitted he made in

14   order to celebrate the upcoming New Year.

15   Therefore it is felt that he would pose a less

16   than average risk for violence when compared to

17   this level II inmate population.  If released to

18   the community, his violence potential is

19   estimated to be no higher than the average

20   citizen in the community."  Okay, was there

21   anything else you wanted to add in terms of your

22   overall intuitional adjustment or

23   accomplishments that we may have missed?

24          INMATE MIJANGOS:  No.

25          DEPUTY COMMISSIONER McBEAN:  No.  Okay,

26   anything to add, Counsel?

27          ATTORNEY RUTLEDGE:  No.

48

1          DEPUTY COMMISSIONER McBEAN:  Okay.  I'll

2     return to the Chair.

3          PRESIDING COMMISSIONER FISHER:  Okay.  I

4     can tell you that the Probation Officers Report,

5     I'll tell you where the gang thing came from.

6     In the Probation Officer's Report, on Page 11,

7     it says, under Interested Parties, it says, "The

8     probation officer contacted the Los Angeles

9     Police Department and Homicide Detective Zalba,

10    Z-A-L-B-A, who reports that the present offense

11    appears to have been a confrontation vendetta.

12    According to their records, the victims were not

13    gang members and apparently defendant had the

14    weapon in his pocket and shot at the approaching

15    victims.  He feels that the defendant should be

16    sentenced to State prison," blah, blah, blah.

17    And then it says, under Evaluation, it says,

18    "The defendant then explained his involvement in

19    the present offense --"

20         DEPUTY COMMISSIONER McBEAN:  I need to

21    turn the tape, I'm sorry.

22              (TAPE 1, SIDE A, ENDS)

23              (TAPE 1, SIDE B, STARTS)

24         DEPUTY COMMISSIONER McBEAN:  Back on

25    record.

26         PRESIDING COMMISSIONER FISHER:  All

27    right, thank you.  It says, "The defendant is

49

1    attempting to minimize his actions by stating

2    that he was acting against gang members who were

3    threatening him.  Information supplied by the

4    Police Department indicates otherwise, that the

5    victims were not known gang members."  So, I

6    don't know where they came up with that.  But I

7    though I would let you know where it is in your

8    file, so that you'll know for future reference.

9    I don't think I have any other questions.  Did

10   you go to trial or was this a plea bargain?

11        INMATE MIJANGOS:  No, it was a Judge, a

12   Judge trial.

13        PRESIDING COMMISSIONER FISHER:  Oh, so

14   you did have a trial but not before a Jury, it

15   was before a Judge.

16        INMATE MIJANGOS:  Just by the Judge.

17        PRESIDING COMMISSIONER FISHER:  And did,

18   well, I guess it's not important.  Do you have

19   anything?

20        DEPUTY COMMISSIONER McBEAN:  I do have a

21   question.  I'm a little confused about how the

22   second victim was shot.  Let me first ask, how

23   far away was the first victim that was shot?

24   When you shot him?

25        INMATE MIJANGOS:  It must have been real

26   close to the (indiscernible).

27        DEPUTY COMMISSIONER McBEAN:  Like one or

50

1    two feet away from you?  It's right next to the

2    window on the driver's side?

3              INMATE MIJANGOS:  Driver's side, yes.

4              DEPUTY COMMISSIONER McBEAN:  Okay, so you

5    shot him at point blank, essentially.

6              INMATE MIJANGOS:  (indiscernible).

7              DEPUTY COMMISSIONER McBEAN:  And victim

8    number two, how far away was he, when you shot

9    him?

10             INMATE MIJANGOS:  He was in front of the

11   car, like, maybe from here to a little further

12   than the wall.

13             DEPUTY COMMISSIONER McBEAN:  Uh huh,

14   okay.  But you say that you pointed at the gun

15   down at the floor?

16             INMATE MIJANGOS:  Down.

17             DEPUTY COMMISSIONER McBEAN:  Where on the

18   floor in the car?  When you fired it.

19             INMATE MIJANGOS:  To the front.

20             DEPUTY COMMISSIONER McBEAN:  The front,

21   where?  Like by your feet?  On the passenger

22   side?

23             INMATE MIJANGOS:  Well, I'm in the

24   driver's side.

25             DEPUTY COMMISSIONER McBEAN:  Right.

26             INMATE MIJANGOS:  Well, (indiscernible)

27   got my arm, I shot to the floor.

51

1          DEPUTY COMMISSIONER McBEAN:  Oh, out of

2     the window.

3          DEPUTY DISTRICT ATTORNEY DELAVIGNE:   To

4     the ground.

5          INMATE MIJANGOS:  Yeah, out of the

6     window.

7          DEPUTY COMMISSIONER McBEAN:  Oh, I see.

8     So were you aiming at the victim?  Victim number

9     two when you shot him?

10          INMATE MIJANGOS:  No.

11          DEPUTY COMMISSIONER McBEAN:  But he was

12     in front of the car, you put your left arm out

13     the window --

14          INMATE MIJANGOS:  (indiscernible).

15          DEPUTY COMMISSIONER McBEAN:  -- and shot

16     in his direction.

17          INMATE MIJANGOS:  It wasn't

18     (indiscernible) but outside to the driver's

19     side.  Not in front on the middle.

20          DEPUTY COMMISSIONER McBEAN:  Okay, so he

21     was basically in front of you as you stuck your

22     arm out the window and you pointed the gun in

23     his direction.  You say you shot at the ground?

24          INMATE MIJANGOS:  (indiscernible).

25          DEPUTY COMMISSIONER McBEAN:  Was he right

26     in front of you then?  Right in front of the

27     gun?

52

1       INMATE MIJANGOS:  Kinda, he was in front.

2       DEPUTY COMMISSIONER McBEAN:  Okay.  So

3   you were actually intending to shot him.

4       INMATE MIJANGOS:  I never point the gun

5   to him.

6       DEPUTY COMMISSIONER McBEAN:  Uh huh, you

7   pointed it in his direction, kind of right in

8   line with him, but you're telling me you pointed

9   it down not up.

10      INMATE MIJANGOS:  To the floor.

11      DEPUTY COMMISSIONER McBEAN:  To the

12  ground.

13      INMATE MIJANGOS:  Ground.

14      DEPUTY COMMISSIONER McBEAN:  Okay.  And

15  then when you shot him, did he fall down?

16      INMATE MIJANGOS:  No.

17      DEPUTY COMMISSIONER McBEAN:  What did he

18  do after you shot him?

19      INMATE MIJANGOS:  Just he was standing

20  there.

21      DEPUTY COMMISSIONER McBEAN:  Right, but

22  then what did he do after that?

23      INMATE MIJANGOS:  Nothing.

24      DEPUTY COMMISSIONER McBEAN:  He just

25  stood there, after you shot him.

26      INMATE MIJANGOS:  Yeah.

27      DEPUTY COMMISSIONER McBEAN:  And what did

53

1  you do?

2       INMATE MIJANGOS:  Tried to get -- tell my

3  family to get into the cars and leave.

4       DEPUTY COMMISSIONER McBEAN:  Okay.

5       INMATE MIJANGOS:  And everybody got into

6  the cars and we left.

7       DEPUTY COMMISSIONER McBEAN:  Hum, so he

8  just stood there?

9       INMATE MIJANGOS:  Yes.

10       DEPUTY COMMISSIONER McBEAN:  Did he have

11  a weapon?

12       INMATE MIJANGOS:  I didn't see one.

13       DEPUTY COMMISSIONER McBEAN:  Was he

14  moving towards you when you shot him?

15       INMATE MIJANGOS:  (indiscernible) I don't

16  think so.

17       DEPUTY COMMISSIONER McBEAN:  Had you ever

18  seen him before?

19       INMATE MIJANGOS:  No.

20       DEPUTY COMMISSIONER McBEAN:  Did you

21  believe he was a gang member?

22       INMATE MIJANGOS:  Yes.  Yeah,

23  (indiscernible).

24       DEPUTY COMMISSIONER McBEAN:  So why did

25  you shoot the second victim?

26       INMATE MIJANGOS:  I didn't have any

27  intention to shot him.

54

1          **DEPUTY COMMISSIONER McBEAN:**  I'm sorry.

2          **INMATE MIJANGOS:**  I never intend to shot

3    him.  I never knew he was shot.

4          **DEPUTY COMMISSIONER McBEAN:**  Okay, what

5    were you intending to do when you fired the shot

6    in his direction?

7          **INMATE MIJANGOS:**  I never shot to his

8    direction.  I shot to the ground.  I was trying

9    to scare them off.

10         **DEPUTY COMMISSIONER McBEAN:**  All right,

11   okay, thank you.  No further questions.

12         **PRESIDING COMMISSIONER FISHER:**  When you

13   were -- during your trial, did anybody come in

14   and explain how he got shot?  If you were aiming

15   toward the ground, did the bullet ricochet and

16   hit him?  How did you hit him if he was up here

17   and you were aiming here, how did he get shot?

18         **INMATE MIJANGOS:**  Ah --

19         **PRESIDING COMMISSIONER FISHER:**  You don't

20   know, okay.  All right.

21         **INMATE MIJANGOS:**  And I never -- nobody

22   said anything about how he got shot during

23   trial.

24         **PRESIDING COMMISSIONER FISHER:**  Okay.

25   And you never wondered about that?

26         **INMATE MIJANGOS:**  No.

27         **PRESIDING COMMISSIONER FISHER:**  Okay.

55

1    That's all right.  Do you have any questions?

2            **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  Yes.

3    If the Panel would ask him if he is right or

4    left-handed?

5            **PRESIDING COMMISSIONER FISHER:**  Are you

6    right or left-handed?

7            **INMATE MIJANGOS:**  I'm right.

8            **PRESIDING COMMISSIONER FISHER:**  Okay.

9            **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  When

10   you fired the first -- when he fired the first

11   shot at the victim who died, did he shot with

12   his right-hand or his left-hand?

13           **INMATE MIJANGOS:**  With my right-hand.

14           **PRESIDING COMMISSIONER FISHER:**  Okay.

15           **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**  And

16   then when he shot the second victim, he has

17   indicated that he shot him with his left-hand.

18   Is that correct?

19           **INMATE MIJANGOS:**  No.

20           **PRESIDING COMMISSIONER FISHER:**  You used

21   your right-hand?

22           **INMATE MIJANGOS:**  Yes.

23           **PRESIDING COMMISSIONER FISHER:**  Okay, so

24   were you, just so we all get an illustration

25   here, if you were sitting in the driver's seat,

26   right, did you twist your body around and shot?

27           **INMATE MIJANGOS:**  No (indiscernible).

56

1        PRESIDING COMMISSIONER FISHER:  What did

2   you do?

3        INMATE MIJANGOS:  When I shot to the

4   ground, I put one leg out of the door.

5        PRESIDING COMMISSIONER FISHER:  Okay, so

6   your door was open.  So you actually turned your

7   whole body around and shot like this.

8        INMATE MIJANGOS:  Yes, I opened the door.

9        PRESIDING COMMISSIONER FISHER:  Okay.

10       INMATE MIJANGOS:  And had my leg out.

11       PRESIDING COMMISSIONER FISHER:  All

12   right.

13       INMATE MIJANGOS:  Out of the door.

14       PRESIDING COMMISSIONER FISHER:  Okay.

15   Anything else?

16       DEPUTY DISTRICT ATTORNEY DELAVIGNE:  I'm

17   trying to clarify it, because when was showing

18   how he shot the second shot --

19       PRESIDING COMMISSIONER FISHER:  Uh huh.

20       DEPUTY DISTRICT ATTORNEY DELAVIGNE:  --

21   he used his left-hand, showing that he shot

22   towards the ground.

23       PRESIDING COMMISSIONER FISHER:  Right.

24       DEPUTY DISTRICT ATTORNEY DELAVIGNE:

25   That's what was confusing me.

26       PRESIDING COMMISSIONER FISHER:  Okay.

27       DEPUTY DISTRICT ATTORNEY DELAVIGNE:  But

57

1    that is not correct?  If you would ask him?

2        PRESIDING COMMISSIONER FISHER:  So what

3    you were doing is when we were asking you about

4    shooting, you were sticking your arm out like

5    this --

6        INMATE MIJANGOS:  No, no.

7        PRESIDING COMMISSIONER FISHER:  Okay, but

8    it was --

9        INMATE MIJANGOS:  I never shot him with

10   the --

11       PRESIDING COMMISSIONER FISHER:  Left-

12   hand.

13       INMATE MIJANGOS:  -- left hand.

14   (indiscernible) right.

15       PRESIDING COMMISSIONER FISHER:  All

16   right.

17       DEPUTY DISTRICT ATTORNEY DELAVIGNE:  So

18   you just fired the two shot?  Is that correct?

19       PRESIDING COMMISSIONER FISHER:  Did you

20   just fire two shots?

21       INMATE MIJANGOS:  I only think I fired

22   more than that.

23       PRESIDING COMMISSIONER FISHER:  Okay, did

24   you -- how many --

25       INMATE MIJANGOS:  Counting, counting with

26   the, one, let's see, about three or four, I

27   think.

58

1       PRESIDING COMMISSIONER FISHER:  Okay.

2       DEPUTY DISTRICT ATTORNEY DELAVIGNE:

3  Referring to the Probation Report, on Page 3,

4  five rounds were, five shell casings were

5  recovered at the location.  Could you have fired

6  all five shots?

7       INMATE MIJANGOS:  If I could have fired?

8       PRESIDING COMMISSIONER FISHER:  No --

9       DEPUTY DISTRICT ATTORNEY DELAVIGNE:  Did

10  you fire five shots?

11      PRESIDING COMMISSIONER FISHER:  Do you

12  think you fired five shots?

13      INMATE MIJANGOS:  Yes.

14      DEPUTY DISTRICT ATTORNEY DELAVIGNE:  And

15  where were the other shots fired?  The other

16  additional three shots.

17      INMATE MIJANGOS:  To the ground.

18      PRESIDING COMMISSIONER FISHER:  Okay, and

19  was that at the same time that Mr. Chavez was

20  hit in the hip?  That was --

21      INMATE MIJANGOS:  That was about the same

22  time.

23      PRESIDING COMMISSIONER FISHER:  Okay, so

24  you fired like boom, boom, boom, boom.

25      INMATE MIJANGOS:  Yes.

26      PRESIDING COMMISSIONER FISHER:  Okay.

27  Anything else Mr. Delavigne?

1      **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**   No,

2   thank you.

3      **PRESIDING COMMISSIONER FISHER:**   All

4   right, Counsel.

5      **ATTORNEY RUTLEDGE:**   No questions.

6      **PRESIDING COMMISSIONER FISHER:**   Would you

7   like to close?

8      **DEPUTY DISTRICT ATTORNEY DELAVIGNE:**   Yes.

9   A couple of things bother me.   First of all, the

10   inmate started off today's Hearing by not

11   telling the truth to the Board when it came to

12   possession of the gun.   He said he bought it at

13   a gun store and he had to wait five-days for him

14   to pick up the gun, which was fairly detailed

15   purchase set forth to the Board.   And then he

16   said, "No it wasn't through a gun shop," he

17   bought it other than that.   That bothered me.

18   And then when confronted on the pruno

19   possession, he was not truthful there.   And I

20   feel that the Board Hearing is, hopefully, a

21   place where an inmate will finally face the

22   truth, tell the truth, and go on from there.

23   But I am going vigorously oppose his getting a

24   suitable Hearing today because of his inability,

25   I think, at this time, to face what the facts

26   were on the crime night, and continuing to not

27   be truthful to the Board.   That bothers me very

60

1    much.   Thank you.

2              **PRESIDING COMMISSIONER FISHER:**   Okay,

3    Counsel.

4              **ATTORNEY RUTLEDGE:**   Mr. Mijangos, I

5    think, when we began the Hearing and the Board

6    was questioning him about his previous situation

7    with his wife, he was very forthwith.   And I

8    think, I'm not sure, before I get into that, I

9    wanted to also point out in the Sentencing

10   Transcript, the Judge that heard the Court

11   Trial, said that the, on Page 6, of the

12   Transcripts, says, "The testimony is un-

13   contradicted that the victim said the word gang

14   members.   Whether it was true or not is not as

15   relevant as the fact that this statement was

16   made and the bottle was thrown at one of the

17   defendant's friends.   And there is no mention of

18   any gang ties or anything in here.   Also, the

19   defense attorney called into question the

20   Probation Report and asked that, it says, "But

21   to build this up into some premeditated vendetta

22   act as the Probation Officer has done, and I

23   realize that the Court feels there was

24   premeditation, which, however, I disagree with

25   that evaluation of this evidence."   So anyway I

26   think he's calling into question the thing about

27   the vendetta.   And the D.A. does not respond to

61

1    that, it goes un-rebutted by the People, they

2    just go into kind of the sentencing scheme.  So

3    anyway I want to point that out.  Mr. Mijangos

4    has no juvenile record prior to this incident.

5    He was married, had children, was a provider for

6    his family, his aunt, who cared for him.  He's

7    displayed stable social history.  As far as

8    remorse goes, in his psych report, it talks

9    about his, "The inmate expressed remorse for

10   killing someone who was unarmed and admits that

11   the amount of force used was excessive for the

12   situation, due to his own panic.  He has also

13   expressed sincere regret and sorrow regarding

14   the victim's daughter, who had to grow-up

15   without her father."  And I think that kind of

16   is the name of the game here, is that

17   Mr. Mijangos seems to have panicked.  And also

18   in the sentencing, the Judge actually talks

19   about that and says, she found it to be second-

20   degree murder, but she talks about the fact that

21   there was, "I'm aware of the facts giving rise

22   to the defendant's entry on the scene that there

23   was a fray."  So it does appear that there

24   wasn't necessarily malice but some type of panic

25   and overreaction to what appeared to be a

26   violent situation on his family.  He doesn't

27   have anything prior to that that would show he

1    was a violent, or just the kind of person who

2    goes out looking to shoot people.  I don't think

3    that's the case at all.  He doesn't have any

4    criminal history.  Since he's been in prison,

5    he's has some minor skirmishes but nothing

6    violent.  He's only had one 115 and a few 128s.

7    He has realistic plans for parole.  He has

8    maintained his family ties throughout the years.

9    He has a family of three.  He has numerous

10    letters on file.  He has secured employment.  He

11    has a plan to do some parole in L.A. and then

12    move to be with his family.  His institutional

13    behavior is good.  He's been very handy while

14    he's been in here.  He indicates to me that he

15    doesn't care about getting his certificates; he

16    just wants to make good use of his time and

17    learn.  But he's received lots of certificates,

18    lots of chronos.  He's participated in self-

19    help.  I think he does, he shows himself to be

20    in the institution a productive person.  And I

21    think that would be, if released, he would also

22    continue to be productive and support his family

23    as he did before he did this.  So I would ask

24    that the Board find him suitable for parole.

25        **PRESIDING COMMISSIONER FISHER:**  Thank

26    you.  Is there anything that you would like to

27    add to what your attorney said on your behalf.

63

1          **INMATE MIJANGOS:**  No.

2          **PRESIDING COMMISSIONER FISHER:**  All

3    right, thank you.  We're going to go ahead and

4    recess.

5                          R E C E S S

6                          --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

64

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3        DEPUTY COMMISSIONER McBEAN:    We're on

4    record.

5        PRESIDING COMMISSIONER FISHER:    All right,

6    thank you.  I want to note for the record that

7    everyone who was previously in the room and identified

8    themselves has returned to the room.  Mr. Mijangos,

9    the Panel has reviewed all information received from

10   the public and relied on the following circumstances

11   in concluding that you are not yet suitable for parole

12   and would pose an unreasonable risk of danger to

13   society or a threat to public safety if released from

14   prison.  I'm going to go ahead and read the decision

15   into the record.  I'm going to tell you this is

16   another three-year denial.  The first thing that we

17   considered was the commitment offense.  This was a

18   situation where there were multiple victims.  It is

19   also a situation where there were a lot of other

20   choices that could have been made.  And I think we all

21   still kind of left here with some questions today

22   about how the second victim got shot and what was

23   going on in the situation there.  This was apparently

24   a case where Mr. Mijangos and his family members were

25   out for the evening.  They came across the victims,

26   who were brothers, who approached Mr. Mijangos' family

27   JAIME MIJANGOS E-81550  DECISION PAGE 1   9/13/05

65

1    members and one of his family members, at least one of

2    his family members, was assaulted.  Ultimately what

3    happened was that Mr. Mijangos, who had a 9-milimeter

4    in his car, that was apparently loaded, used the gun

5    to shot the two victims rather than perhaps using it

6    to threaten them and get everybody out of the area,

7    which might have been a better choice, or rather than

8    to call the Police, which might have even been a

9    better choice.  The bottom line is the motive for

10   murdering one person and shooting another one was

11   really trivial in relation to what was going on at the

12   time and completely not necessary.  Mr. Mijangos, who

13   has represented himself as a victim in this case,

14   didn't act like a victim after the shooting, he acted

15   like somebody who felt guilty for something.  And he

16   went home, he didn't call the police, he didn't try to

17   get assistance for the victims who had been shot.  And

18   it was his wife who called the Police and ultimately

19   had him arrested for this crime.  He does not have an

20   escalating pattern of criminal conduct.  He has one

21   prior arrest, and that was corporal injury to a

22   spouse.  That case didn't go forward because his wife

23   did not file a complaint.  He seems to have a stable

24   social history.  He's programmed in a somewhat limited

25   manner while he's been incarcerated.  Although he has

26   upgraded vocationally, he has two vocations.  He has

27   **JAIME MIJANGOS E-81550  DECISION PAGE 2  9/13/05**

66

1    had only one 115 disciplinary report while he's been

2    incarcerated for this offense.  And that was for

3    possession of inmate alcohol and that was back in '92.

4    He's had four 128A Counseling chronos, the last one

5    was back in '98.  The psychological evaluation is

6    dated 4/16/01, it's authored by Dr. Gamard, and it

7    really is largely supportive.  It says, "That he would

8    pose a less than average risk for violence when

9    compared to the Level II inmate population.  And that

10   his violence potential if released to the community is

11   no higher than the average citizen."  The Hearing

12   Panel notes that in response to 3042 Notices that the

13   District Attorney of Los Angeles County as well as the

14   Los Angeles Police Department both indicated

15   opposition to a finding of suitability at this time.

16   We want to commend Mr. Mijangos for the work that he's

17   been doing.  He has, let's see here, he started in

18   2003, participating in AA.  He participated in

19   Maricanan Life Skills.  And as I noted earlier, he has

20   completed two vocations.  However, currently the

21   positive aspects of his behavior do not out weigh the

22   factors of unsuitability.  In a separate decision, the

23   Hearing Panel finds the prisoner has been convicted of

24   murder, and it is not reasonable to expect parole

25   would be granted at a Hearing during the following

26   three years.  The specific reasons for this finding

27   **JAIME MIJANGOS E-81550  DECISION PAGE 3  9/13/05**

67

1    are as follows:  First of all, the offense.  Once

2    again, there were two victims here.  Mr. Mijangos was

3    armed, and for some reason, at the scene he choice

4    violence as his solution to the situation that was

5    going on at the time, which apparently was some kind

6    of an altercation between members of his family and

7    the two victims.  And having, according to what we

8    heard today, done this murder because he felt that

9    somehow he was under attack and had to defend himself

10   and his family members, which would certainly, I would

11   think, characterize oneself as a victim, he left the

12   scene.  His wife locked up the gun, in a lockbox.  He

13   didn't call the Police, he didn't call for help, and

14   as a result one of the victims, who was shot, died.

15   And he waited until his wife called the Police and he

16   was arrested before he made any kind of contact with

17   law enforcement about this situation.  The bottom line

18   is this, Mr. Mijangos, you lied to us today about

19   really little trivial things.  That really gave us

20   pause.  You mischaracterized how you got the gun and

21   where it came from and whether it was legal or not

22   when I asked you about why you didn't call the police.

23   You were incredibly evasive when Commissioner McBean

24   was asking you about the inmate-manufactured alcohol.

25   I mean, we gave you multiple opportunities to just

26   come clean on the little stuff today, and you didn't

27   **JAIME MIJANGOS E-81550  DECISION PAGE 4   9/13/05**

68

1    want to do that.  The situation of putting your arm

2    outside the car and shooting at the ground and somehow

3    this guy miraculously gets shot in the hip.  You had

4    no explanation for that.  And when I asked you if you

5    weren't curious about, if this was an accident and you

6    were shooting at the ground, how this guy got shot,

7    you didn't seem to really be interested.  You know,

8    there's nothing about your presentation today that

9    came across as straightforward, insightful, or

10   remorseful.  And those are the issues that we need to

11   see you deal with in the next three years.  I would

12   suggest to you that because of the inmate-manufactured

13   alcohol, because of the fact that your file indicates

14   that you dabbled some in smoking marijuana at some

15   point in your history, that you should stay in

16   something like AA for the rest of the time that you

17   are in prison.  Because once the Panel gives you a

18   date, the Governor's Office is going to review your

19   file, and I can tell you from experience, that they

20   are going to want you to be in substance abuse

21   programming for a long time, before they're going to

22   be comfortable with you.  The other thing that I would

23   suggest to you is that you do some work in the areas

24   of anger management and victim impact.  If you can't

25   do it through the institution, then do it on your own,

26   you know, just get some books and work on it yourself.

27   **JAIME MIJANGOS E-81550   DECISION PAGE 5   9/13/05**

69

1   But, you know, I just do not understand why you would

2   split hairs like that with us today on issues that

3   were seemingly unimportant. And I think that it would

4   be beneficial for you to sit down and do an Olson

5   Review before your next Hearing. And if you come in

6   here to talk to the Panel, come in prepared just to

7   say what everything is. Just be as straightforward as

8   you can. Because it doesn't do you any good to come

9   in here and appear like you are trying to hide things

10  from us. It just makes us real uncomfortable. That

11  completes the reading of the decision. Do you have

12  any comments?

13      **DEPUTY COMMISSIONER McBEAN:** I just agree with

14  everything that Commissioner Fisher has said. And I

15  think that you have some work to do and I just hope

16  that you will take the opportunity during the next

17  three years to really get to work on it. Good luck to

18  you.

19      **PRESIDING COMMISSIONER FISHER:** Thank you.

20                      oOo--

21

22

23  **PAROLE DENIED THREE YEARS**

24  **THIS DECISION WILL BE FINAL ON:**_____

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **JAIME MIJANGOS E-81550  DECISION PAGE 6  9/13/05**

70

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, JUDY K. FARNCOMB, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total One in number and

cover a total of pages numbered 1 - 69, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF JAIME

MIJANGOS, CDC NO. E-81550, on SEPTEMBER 13, 2005, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated September 27, 2005, at Sacramento,

California.

JUDY K. FARNCOMB
TRANSCRIBER
PETERS SHORTHAND REPORTING