1  Jaime Migangos, E-81550
2  P.O. Box-689, G-208L
   Soledad, CA 93960-0689
3
   Petitioner in Pro Per
4

*FILED*

*07 OCT 30 AM 10:30*

*RICHARD W. WIEKIN*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

5          In the United States District Court

6          for the Northern District of California

7                                                        **SBA**

8  Jaime Mijangos,

9                    Petitioner         **CV-07**: ___ **5508**

10                                   )  REQUEST/MOTION FOR
                                     )  JUDICIAL NOTICE
11         vs.                       )
                                     )
12                                   )
   A.P. Kane, Warden CTF,            )
13                                   )
   ─────────────────────────────    )   **E-filing (PR)**
14              Respondent           )
                                     )
15 Arnold Schwarzenegger, Governor, and )
   Board of Parole Hearings,         )
16                                   )
   ─────────────────────────────    )
17         Real Parties in Interest  )

18

19 TO: THE HONORABLE UNITED STATES DISTRICT COURT JUDGE FOR THE NORTHERN

20 DISTRICT OF CALIFORNIA:

21      Pursuant to Federal Rules of Evidence §201(a)-(f), Petitioner Jaime

22 Mijangos (hereinafter "Petitioner") hereby requests this Court to take

23 Judicial Notice of the following court orders and docket sheets from

24 the Superior Court of California for the County of Los Angeles; the

25 California Court of Appeal, Second Appellate Division; and the California

26 Supreme Court:

27      1. In the case of In re Shaputis (2005) 37 Cal.Rptr.3d 324 (Exhibit

28 A), depublished but not overturned by the California Supreme Court

Page 1 of 4.

1   (S141547) on May 17, 2006 at 2006 DJDAR 6008 (Exhibit B).

2      2. In the case of <u>In re Robert Rosenkrantz</u>, Los Angeles Superior

3   Court (BH003529) June 26, 2006 (attached at Exhibit C) and in the docket

4   sheets for <u>In re Rosenkrantz</u> demonstrating denial of Petition for Writ of

5   Supersedeas in the California Court of Appeal (B192676) on July 31, 2006

6   (Exhibit D) and denial of Petition for Review in the California Supreme

7   Court (S145507) on August 3, 2006  (attached at Exhibit E).

8      It is Petitioner's position that the attached court rulings and

9   docket sheets (attached at Exhibits A through E) are relevant and

10  admissible to allow fair and complete adjudication by this Court of the

11  claims set forth in Petitioner's Petition for Writ of Habeas Corpus, filed

12  simultaneous to this motion.

13            **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

14            **PETITIONER'S MORION/REQUEST FOR JUDICIAL NOTICE**

15  Federal Rules of Evidence §201 states in part:

16              (a)   Scope of Rule.  This rule governs only
17         judicial notice of adjudicative facts;

18              (b)   Kinds of facts.  A judicially noticed fact
           must be one not subject to reasonable dispute (2) capable
19         of accurate and ready determination by resort to sources
           whose accuracy cannot be questioned;

20              (d)   When mandatory.  A court shall take judicial
           notice of requested by a party and supplied with the
21         necessary information.

22              (f)   Time of taking notice.  Judicial notice may be

23         taken at any stage of the proceeding.

24  Although each case must be decided on its own merits, this Court is

25  empowered to take Judicial Notice of court files, records and unpublished

26  cases.  (See <u>Scheitzed v. Scott</u> (1979 C.D. Cal.) 469 F.Supp 1017, 1020;

27  <u>Phelps v. Provident Life & Acc. Ins. Co.</u> (1999 C.D. Cal) 60 F.Supp.2d

28  1014, 1017 [unpublished cases may be submitted under judicial notice];

1  Marks v. CDW Computer Centers, Inc. (1995 N.D. Ill.) 901 F.Supp 1302,

2  1310, citing retired Chicago Police Association, et al. v. City of

3  Chicago, et al. (7th Cir. 1993) 7 F.3d 584 [courts can take judicial

4  notice of the decisions of federal and state courts]; Lee v. City of Los

5  Angeles (9th Cir. 2001) 250 F.3d 668, 690 [same]; and Smith v. Duncan

6  (9th Cir. 2002) 297 F.3d 809, 815 [same].)

7      Also, this Court may take Judicial Notice of matters of public

8  records outside the pleadings and may consider orders in other actions

9  and records and reports of administrative bodies.  (See Allfast Systems

10 v. Briles Rivit Corp. (1998) C.D. Cal.) 16 F.Supp.2d 1154, 1159 n.9.; and

11 Biggs v. Terhune (9th Cir. 2003) 334 F.3 910, 915 n.3, citing Papai v.

12 Harbor Tug & Barge Co. (9th Cir. 1995) 67 F.3d 203, 207 n.5.)

13     As such, the California Appellate and State Supreme Court opinon(s)

14 in the depublished, but not overrulled, case of In re Shaputis (2005) 37

15 Cal.Rptr.3d 324 (Exhibits A and B); the Superior Court of Los Angeles

16 order in the case of In re Robert Rosenkrantz,  June 26, 2006, No.

17 BH003529, (Exhibit C) and in the docket sheets for In re Rosenkrantz

18 demonstrating denial of Petition for Writ of Supersedeas (No. B192676)

19 on July 31, 2006 (Exhibit D) and denial of Petition for Review (No.

20 S145507) on August 3, 2006 (Exhibit E) are reviewable and admissible

21 for consideration by this Court through Petitioner's Motion/Request for

22 Judicial Notice herein.

23

24 Date: 10/21/07                Respectfully Submitted,

25

26                              _____
                                Jaime Mijangos,
27                              In Pro Per

28

**DECLARATION OF JAIME MIJANGOS**

I, Jaime Mijangos, declare the following:

1. That the attached depublished but not overruled case at Exhibit A of In re Shaputis (2005) 37 Cal.Rptr.3d 324 is a true and correct copy as reported in California Reporter, Third Edition.

2. That the attached order at Exhibit B of depublication by the California Supreme Court on May 17, 2006 in the case of In re Shaputis (S141547) 2006 DJDAR 6008 is a true and correct copy of the order as reported in Daily Journal Daily Appellate Report, May 19, 2006.

3. That the attached case at Exhibit C in the order of In re Robert Rosenkrantz, Los Angeles Superior Court (BH003529) June 26, 2006 is a true and correct copy of the order as reported by the Clerk of the Superior Court of Los Angeles County.

4. That the docket sheets for In re Rosenkrantz demonstrating denial of Petition for Writ of Supersedeas in the California Court of Appeal (B192676) on July 31, 2006 (attached at Exhibit D) and denial of Petition for Review in the California Supreme Court (S145507) on August 3, 2006 (attached at Exhibit E) are true and correct copies of the respective court dockets as published on the internet on August 10, 2006 by California Appellate Courts at http://appellatecases.courtinfo.ca.gov/search/case/dockets.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: _10/31/07_____          _____
                                         Jaime Mijangos,
                                         Petitioner In Pro Per

# EXHIBIT A



**37 CALIFORNIA REPORTER, 3d SERIES**

(a)(1); its use is incompatible with the 60-year time limit.

In order to avoid a statutory absurdity, we hold that "a notice of default under section 2924 that is recorded more than 10 years after "the last date fixed for payment" of the debt or performance of the [underlying] obligation" does not constitute a part of the "record" for purposes of section 882.020, subdivision (a).

## IV. DISPOSITION

The trial court's grant of summary adjudication is reversed. The matter is remanded for further proceedings, consistent with this decision.

We concur: MARCHIANO, P.J., and SWAGER, J.

---

In re Richard SHAPUTIS, on Habeas Corpus.

No. D048356.

Court of Appeal, Fourth District, Division 1.

Dec. 28, 2005.

**Background:** Petitioner who had been denied parole by Board of Prison Terms (BPT) filed petition for writ of habeas corpus. The Superior Court, San Diego County, No. HC18007, Kerry Wells, J., denied petition, and petitioner sought writ of habeas corpus in the Court of Appeal.

8. Because of the narrow basis for our holding, we render no opinion about (1) the legal effect of a notice of default recorded before the expiration of 10 years; or (2) the effect of

**Holdings:** The Court of Appeal, McDonald, J., held that:

(1) "some evidence" did not support BPT's finding that petitioner committed his second degree murder in especially cruel or callous manner;

(2) some evidence did not support finding that murder was dispassionate or calculated;

(3) evidence did not support finding that petitioner posed unreasonable risk of danger to society; and

(4) proper disposition was remand to BPT for new hearing.

Petition granted.

Benke, Acting P.J., filed a dissenting opinion.

### 1. Pardon and Parole ⊂⇒53

Criteria in regulation for determining suitability for parole are "general guidelines, illustrative rather than exclusive, and the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the Board of Prison Terms (BPT). West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

### 2. Pardon and Parole ⊂⇒48.1

In determining an inmate's suitability for parole, the task of the Board of Prison Terms (BPT) is to try to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

any other recorded document that discloses the final maturity date, regardless of its recordation date.

---

**325**
**In re SHAPUTIS**
Cite as 37 Cal.Rptr.3d 324 (Cal.App.4.Dist. 2005)

### 3. Habeas Corpus ⊂⇒812

When the trial court denies habeas relief to an inmate who has been denied parole, the ensuing writ proceeding is an original proceeding that requires the Court of Appeal to independently review the record.

### 4. Pardon and Parole ⊂⇒52

The standard that a decision of the Board of Prison Terms (BPT) to deny parole be supported by "some evidence" is extremely deferential and requires only a "modicum of evidence." West's Ann.Cal.Penal Code § 3041.

### 5. Pardon and Parole ⊂⇒62

A court may not vacate an administrative decision to deny parole, which is subject to "some evidence" standard of review, simply because it disagrees with the assessment by the Board of Prison Terms (BPT); the decision must be devoid of a factual basis to be overturned. West's Ann.Cal.Penal Code § 3041.

### 6. Pardon and Parole ⊂⇒62

Because judicial review of a parole denial is to ensure that a decision of the Board of Prison Terms (BPT) is not arbitrary and capricious, thereby depriving the prisoner of due process of law, the court may inquire only whether some evidence in the record before the BPT supports the decision to deny parole, based upon the factors specified by statute and regulation. U.S.C.A. Const.Amend. 14; West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

### 7. Pardon and Parole ⊂⇒52

The discretion of the Board of Prison Terms (BPT) over parole suitability determinations, although broad, is not absolute. West's Ann.Cal.Penal Code § 3041.

### 8. Pardon and Parole ⊂⇒58

"Some evidence" did not support finding of Board of Prison Terms (BPT) that inmate seeking parole committed his second degree murder of his wife in especially cruel or callous manner, so as to involve some callousness, but inmate's single gunshot to wife's neck causing instantaneous death did not involve aggravated conduct such as torture, torment, or gratuitously increasing or prolonging her pain and suffering. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402(c)(1)(D).

### 9. Pardon and Parole ⊂⇒49

Parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable for parole; to deny parole there must be some evidence the inmate engaged in conduct apart from "and beyond the minimum conduct necessary to convict him of second degree murder." West's Ann.Cal.Penal Code § 3041.

### 10. Pardon and Parole ⊂⇒58

Finding of Board of Prison Terms (BPT) that inmate seeking parole committed his second degree murder of his wife in dispassionate or calculated manner was not supported by "some evidence", wife died from single gunshot, and inmate had been granting that right, made no attempt to conceal crime or weapon, and voluntarily surrendered to police. West's Ann.Cal.Penal Code § 2402(c)(1)(B).

### 11. Pardon and Parole ⊂⇒58

Evidence of inmate's alcohol-related disharmony with wife he murdered and misconduct toward daughters did not support finding of Board of Prison Terms

**326**   37 CALIFORNIA REPORTER, 3d SERIES

(BPT) that inmate posed 'unreasonable risk of danger to society if released on parole based on his 'unstable social relationships' inmate had been involved in stable relationships throughout his life, his alcoholism was in sustained remission, and his postincarceration conduct was exemplary. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402(c)(3).

**12. Pardon and Parole ⟵62**

Remand to Board of Prison Terms (BPT) for 'new suitability' hearing was proper remedy for BPT's denial of parole based on 'findings of unsuitability' that were not supported by some evidence. West's Ann.Cal.Penal Code § 3041.

**13. Pardon and Parole ⟵62**

A court reviewing a parole decision by the Board of Prison Terms (BPT) is precluded from independently resolving conflicts in the evidence, determining the weight to be given the evidence, or deciding the manner in which the specified factors relevant to parole suitability are to be considered and balanced; these are matters exclusively within the discretion of the BPT. West's Ann.Cal.Penal Code § 2402. 15 CCR § 2402.

Law Offices of Marc Elliot Grossman and Marc Elliot Grossman, 'Upland,' for Petitioner.

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Michelle Des Jardins and Heather Bushman, Deputy Attorneys General, for Respondent.

_____

1. Although this court reversed the original conviction and remanded the matter for retrial, the jury in the second proceeding again convicted him of second degree murder.

**McDONALD, J.**

Petitioner Richard Shaputis was sentenced to 15 years to life following a 1987 conviction for second degree murder. Shaputis, now 69 years old, has remained in prison for the past 18 years and has been an exemplary prisoner with an unblemished record of rehabilitative progress. Nevertheless, the Board of Prison Terms (the BPT) found him unsuitable for parole at hearings conducted in 1997, in 2002, and, finally in 2004. The most recent denial, challenged by the petition for writ of habeas corpus, was based on the BPT's conclusion that Shaputis posed an unreasonable risk of danger to public safety were he to be released from prison, even though the third party evaluations have consistently concluded he posed a low risk of danger to the public, were he paroled.

Shaputis asserts the BPT's conclusion has no evidentiary support and therefore violates his due process right to parole. He argues the BPT's conclusion was improperly based on the circumstances of his offense and his interpersonal skills prior to 1987, and there is no evidence he poses a risk of danger in his current condition.

### FACTS

#### A. The Offense

In 1987 a jury convicted Shaputis of the second degree murder of his wife, Irma, and found true that he used a firearm in the commission of the offense. He was sentenced to 15 years to life with the

2. Now known as the Board of Parole Hearings.

---

**327**   IN RE SHAPUTIS

Cite as 37 Cal.Rptr.3d 324 (Cal.App. 4 Dist. 2006)

possibility of parole, plus a determinate two-year sentence for the firearm use.

Shaputis and Irma had been married for 23 years and their relationship was marked by domestic violence. Two years earlier, Irma complained that Shaputis had beaten her and cracked her ribs, and approximately 18 months earlier Shaputis had shot at his wife when they had been drinking and arguing. Shaputis apparently beat Irma at least two or three times per year, and had threatened her with a knife. However, none of these alleged events resulted in criminal charges.

On the night of the murder, Shaputis called 9-1-1 around 10:00 p.m. and stated he had fought with his wife and that he but claimed it was an accident. When police arrived at Shaputis's home the dispatcher surrendered without incident. When police entered the house they found Irma's body in the living room with a handgun lying nearby. The autopsy report concluded Irma was killed sometime between 8:30 p.m. and 10:30 a.m. and her death was caused by a single gunshot wound to the neck. The shot had been fired from close range, possibly as close as two feet, and had entered the neck between the junction of the neck and jaw. Death was apparently instantaneous. Shaputis was a heavy drinker who became violent when intoxicated, and he had been drinking on the night of the murder.

#### B. Shaputis's Background

Shaputis's mother deserted the family when he was nine years old, and he was raised by his siblings with the assistance of his

3. The BPT concluded the gun could not have been fired accidentally because his finger had to exert a minimum of ... pounds of pressure before pulling the trigger, and this position, before pulling the trigger ... was a 'transfer pull' as opposed to accidental discharge. Although this information is cited in the "Life Prisoner Evaluation Report"

grandparents. His father physically abused him. Shaputis moved out of the home when he was 18 years old and began working.

Shaputis, who was married twice, had a substance abuse problem. His first marriage lasted nine years, and produced four daughters, of whom he was awarded custody after the divorce. Shaputis subsequently married Irma and, although his marriage lasted 23 years, it was marked by domestic violence. Additionally, in 1978 Shaputis received an ... to a misdemeanor soliciting of a murder ... a 1975 nonsupport offense, the 1978 solicitation offense, and other offenses with one of his daughters was the most serious of his criminal record.

#### C. Shaputis's Performance in Prison

Shaputis's record during his 17 years of incarceration was impeccable. He has been disciplinary free for his entire term and his work record was exemplary. He fully participated in all available AA and NA programs, since 1991, and completed all applicable therapy programs. He has the lowest classification score possible for a life-term inmate, and has numerous commendations for his work, conduct and reformed efforts from prison staff ...

The [PER] prepared ...

37 CALIFORNIA REPORTER, 3d SERIES

## HISTORY OF PROCEEDINGS

### A. The 1997 and 2002 BPT Proceedings

Shapiuts's minimum eligible parole date was in September 1998. At his first parole hearing in 1997, the LPER prepared by his prison counselor for submission at the 1997 BPT hearing stated his "progress in state prison could best be described as exemplary" and concluded Shapiuts "would probably pose a low degree of threat to the public at this time, if released from prison." The BPT denied parole apparently based on "an unsuitability determination, and recommended he remain discipline free and participate in self-help and therapy groups. At Shapiuts's second parole hearing conducted in 2002, the LPER confirmed he had remained discipline free and participated in self-help groups, and again expressed the opinion (based on Shapiuts's commitment offense, his prior record, and his prison adjustment) that Shapiuts "would probably pose a low degree of threat to the public at this time if released from prison." The BPT again denied parole, apparently based on an unsuitability determination, and again recommended he remain discipline free and participate in self-help and therapy groups.

4. Mura's risk of violence assessment evaluated three elements. Shapiuts's history and "management" of three risk factors. Because Shapiuts's "history of violence" appeared intertwined with his alcoholism, Mura concluded the risk based on this history was low absent a relapse into alcoholism. Shapiuts's clinical presentation showed some growth in insight and Mura believed this factor evidenced a low risk for violence as long as he remained sober and involved in activities that held his interest. Finally, Mura stated Shapiuts's ability to handle future crises in a "nonviolent manner" was also largely rooted in his ability to remain sober. Mura believed Shapiuts's prison ...

### B. The 2004 BPT Proceedings

#### The Forensic Evaluations

Dr. Mura, a forensic psychologist, evaluated Shapiuts's psychological condition and submitted his report to the BPT in connection with Shapiuts's 2004 parole hearing. Dr. Mura's report stated Shapiuts had feasible and appropriate plans for his life if granted parole, and appeared very committed to maintaining his sobriety through continued involvement with AA. When assessing Shapiuts's risk for violence if paroled, Dr. Mura concluded he presented a low risk for violence absent a relapse into alcoholism.

The LPER prepared by Shapiuts's prison counselor for his 2004 BPT hearing, again noted his exemplary prison record, and that he had "fully adhered" to the BPT's prior recommendations. The report again concluded, considering the commitment offense, his prior "criminal record, and his adjustment in prison, Shapiuts would "probably pose" a low degree of threat to the public at this time if released from prison.

#### The Determination

The BPT considered the materials presented, including the forensic evaluations, and concluded Shapiuts was not suitable for parole because he posed "an unreasonable risk of danger to society or a threat to the public safety if released from prison."

The BPT cited two findings from this conclusion. First, the BPT found the commitment offense was "carried out in an especially cruel and/or callous manner" and was committed at close range with a single shot. Second, the BPT found Shapiuts had a "history of unstable and tumultuous [sic] relationships with others" and had assaulted his wife.

5. The LPER Prisoner Evaluation Reports previously noted by Shapiuts's prison counselor for submission to his 1997 and 2002 parole hearings expressed the same opinion that Shapiuts posed a low degree of threat to the public if released from prison.

record (e.g. his commitment to his "A" program and his demonstrated ability to comply with rules) and his current physical condition (a senior citizen with chronic health problems that would limit concerns over acting out in inappropriate ways) made Shapiuts a low risk for future violence.

## III

### LEGAL FRAMEWORK

#### A. Parole Suitability

Penal Code section 3041 provides the framework for parole decisions for indeterminate life inmates. Subdivision (a) requires that, one year prior to the inmate's minimum release date, the BPT meet with the inmate and normally set a parole release date. However, subdivision (b) provides that, if consideration of the public safety requires a more lengthy period of incarceration, the BPT need not set a parole release date.

In making the section 3041 subdivision (b) suitability determination, the BPT is charged with considering "all relevant, reliable information." (Cal.Code Regs., tit. 15, § 2402, subd. (b).) Including the nature of the commitment offense and behavior before, during, and after the crime, the prisoner's social history, mental state, criminal record, attitude towards the crime, and parole plans. (§ 2402, subd. (b).) The circumstances tending to show unsuitability for parole include that the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner.

The factors that support a finding the offense was committed in an especially heinous, atrocious or cruel manner (§ 2402, subd. (c)(1)) include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.

6. All further references to section 2402 are to title 15 of the California Code of Regulations, section 2402.

7. Factors that support the finding the crime was committed in an especially heinous, atrocious or cruel manner (§ 2402, subd. (c)(1)) ...

(5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (§ 2402, subd. (c).) A factor that alone might not establish unsuitability for parole may contribute to a finding of unsuitability. (§ 2402, subd. (b).)

Circumstances tending to show *suitability* for parole include that the inmate: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress had built over a long period of time; (6) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use on release; and (9) has engaged in institutional activities that suggest an enhanced ability to function within the law on release (§ 2402, subd. (d).)

[1, 2] These criteria are "general guidelines," illustrative rather than inclusive, and the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the BPT. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 679, 128 Cal.Rptr.2d 104, 59 P.3d 174 (*Rosenkrantz*); § 2402, subds. (c), (d).) The BPT's task is to try to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz*, at p. 655, 128 Cal. Rptr.2d 104, 59 P.3d 174.)

**B. *Standard of Review***

[3] "Because judicial review of a parole denial is to ensure that a decision of the BPT is not arbitrary and capricious, thereby depriving the prisoner of the process of law, 'the court may

(2004) 119 Cal.App.4th 871, 884, 15 Cal. Rptr.3d 82 (*Scott*).)

In *Rosenkrantz* the California Supreme Court addressed the standard the courts apply when reviewing parole decisions by the executive branch. The court first held that, "the judicial branch is authorized to review the factual basis of a decision of the [BPT] denying parole in order to ensure that, the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the [BPT] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.) The court further held that "courts properly can review ... a Governor's decisions whether to affirm, modify, or reverse parole decisions by the [BPT] to determine whether they comply with the process of law, and that such review properly can include a determination of whether the factual basis of such a decision is supported by *some evidence* in the record that was before the [BPT]. (*Id.* at p. 660, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.)

[4–6] "The 'some evidence' standard is 'extremely deferential' and requires only "a 'modicum of evidence'." (*Rosenkrantz, supra*, 29 Cal.4th at pp. 664–665, 128 Cal.Rptr.2d 104, 59 P.3d 174.) A court may not vacate an administrative decision subject to the "some evidence" review simply because it disagrees with the BPT's assessment. (*Id.* at p. 679, 128 Cal. Rptr.2d 104, 59 P.3d 174.) The decision must be "devoid of a factual basis" to be overturned. (*Id.* at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

inquire only whether some evidence in the record before the [BPT] supports the decision to deny parole, based upon the factors "specified by statute and regulation." (*Id* at pp. 657–658, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

[7] The BPT's discretion over parole suitability determinations, although broad, is not absolute. (*Scott, supra,* 119 Cal. App.4th at p. 884, 15 Cal.Rptr.3d 82.) *Rosenkrantz* explained that, if "the [BPT's] decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the [BPT] to vacate its decision denying parole and thereafter to proceed in accordance with the process of law." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

**IV**

**ANALYSIS**

The BPT does not dispute the only evidence on all relevant parole *suitability* factors, as well as the only evidence on all but two of the parole *unsuitability* factors, militated in favor of finding Shaputis suitable for parole. Notwithstanding this evidentiary milieu, the BPT found he was unsuitable for parole because it concluded two of the unsuitability factors—the commitment crime itself and Shaputis's pre-incarceration history of relationships with women—bade him a danger to society if released on parole. We are charged with the obligation to ensure the BPT's decision

8.  Section 2402, subdivision (c)(1) also lists as factors that support the finding the crime was committed "in an especially heinous, atrocious or cruel manner" (§ 2402, subd. (c)(1)) and that multiple victims were involved; the victim was abused, defiled, or mutilated during

comports with the requirements of due process of law and we see can discharge that obligation only if we are satisfied there is some evidence in the record before the BPT to support its factual basis for its findings. (*Rosenkrantz, supra,* 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174; *In re Dannenberg, supra,* 34 Cal.4th at pp. 1095–1096 and fn. 16, 23 Cal.Rptr.2d 417, 104 P.3d 783.)

**A. *The Commitment Offense***

The BPT considered Shaputis posed an unreasonable risk of danger if released on parole because he committed the offense in an especially cruel and/or callous manner (apparently cruel and/or callous disregard (apparently cruel and/or dispassionate (c)(1)(D)) and in an especially dispassionate and/or calculated manner (apparently involving section 2402, subdivision (c)(1)(3)).[8]

*Evidence the Murder Was Especially Cruel and/or Callous*

[8] Section 2402, subdivision (c)(1)(D), describing one of the factors that supports a finding the crime was committed "in an especially heinous, atrocious or cruel manner, provides the offense was "carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." Shaputis contends, there is no evidence to support this finding. The BPT's only reference to the *evidence* supporting this finding—is that at close range that perforated her larynx, from a single gunshot wound fired at close range that perforated her larynx, spinal cord column and spinal cord—shows the crime was not committed in an exceptionally callous manner disregarding the victim's suffering, because the forensic evidence appears to confirm the gunshot

or after the crime, and the motive for the crime was inexplicable or very trivial in relation to the offense. The BPT did not cite these factors, and we do not further consider them.

## 3582

induced/instantaneous death rather than a painful or lingering death.

[9] We agree with the observation made by several courts, recently articulated in *Scott, supra*, 119 Cal.App.4th at p. 891, 15 Cal.Rptr.3d 32, that, "[A]ll second degree murders by definition involve some callousness—i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. [Citation.] As noted however, parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render... one unsuitable." Quoting *In re Smith* (2003) 114 Cal.App.4th 343, 366, 8 Cal.Rptr.3d 655. Accordingly, the BPT cannot rely on the mere conviction for second degree murder, to deny parole under the exceptionally callous or cruel factor. As *Rosenkrantz* cautioned, "to deny... parole on that ground there must be some evidence Shaputis engaged in conduct, apart from and beyond the minimum necessary to convict him of second degree murder. (*In re Dannenberg, supra*, 34 Cal.4th at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783) that usually

*Rosenkrantz* explaining why the nature of the offense alone may constitute evidence that gives rise... and the minimum elements... sustain a conviction for second degree murder... stated that, "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of the... process violation—for example, where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense... Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public."  [Citation.]  The [BPT's] authority to make an exception for the requirement of setting a parole date based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is normally to be

or callously exaggerated the victim's suffering.

The record is devoid of any evidence of aggravated conduct reflecting an exceptionally callous disregard for human suffering." As in *In re Smith, supra*, 114 Cal.App.4th 343, 7 Cal.Rptr.3d 655, there is no evidence Shaputis "tormented, terrorized, or injured [his victim] before deciding to shoot [her], or that he gratuitously increased or unnecessarily prolonged her pain and suffering." Was the crime callous? Yes. However, are the facts of the crime some evidence that [Shaputis] "acted with exceptionally callous disregard for [the victim's] suffering, or do 'the facts distinguish this crime from other second degree murders as exceptionally callous'? No." [Citation.] (*Id.* at p. 367, 7 Cal.Rptr.3d 655.)

Because the relevant evidence shows no conduct (beyond the minimum required for conviction of second degree murder) showing a callous disregard for human suffering, the BPT's use of this factor was arbitrary and capricious. (*Scott, supra*, 119 Cal.App.4th at p. 891...) Therefore, a life term, offense or aggravated conduct that shows a callous... should be... the denial of a parole date."

[10] Under the BPT's instructions used to set the base term, for a life prisoner, the circumstances of this offense would facially qualify Shaputis for one of the lowest base terms applicable to a person who directly caused the death of the victim, because death was almost immediate and was not the result of severe trauma (such as: beating, clubbing, stabbing, strangulation, suffocation, burning, or multiple wounds) or following a period of torture." (Cal.Code Regs., tit. 15, § 2282, subd. (b)(1)(B).)

Cal.Rptr.3d 32... subdivision (c)(1)(B), describing a factor that can support a finding that the crime was committed "in an especially heinous, atrocious or cruel manner," provides that the offense was committed "in a dispassionate and calculated manner." Shaputis contends there is no evidence to support this finding. The BPT's only reference to the evidence supporting this finding was again to note the manner of the death (e.g. the victim died from a single gunshot wound fired at close range that perforated her larynx, spinal cord and column and spinal cord). The same report from which this manner of death was drawn also noted Shaputis was an alcoholic who became violent when drunk and he had been drinking the night of the shooting. Moreover, he made no attempt to conceal the crime or the weapon, but instead called police and surrendered within 90 minutes of the shooting and appeared upset when interviewed by police that night.

The BPT's finding that Shaputis acted in a dispassionate and calculated manner, in

11. The forensic psychological evaluation stated Shaputis and his wife were both drunk and arguing immediately before the shooting. The evidence at Shaputis's trial showed the victim had a blood alcohol level of .22 and Shaputis, when tested some six hours after the shooting, still had a blood alcohol level of... (*People v. Shaputis, supra*, D012507, at p. 3.)

12. BPT asserts there was other evidence supporting this finding. For example, BPT notes it was undisputed Shaputis was an alcoholic. However, it does not appear substance abuse history of unstable relationship, being of a history of unstable relationships, a finding of a Shaputis's alcoholism is only germane, insofar as it was a contributing cause of his unstable

## 3583

### *Evidence the Murder Was Dispassionate or Calculated*

addition to being inconsistent with the jury's verdict acquitting him of first degree murder (*cf. Scott, supra*, 119 Cal.App.4th at pp. 889–890, 15 Cal.Rptr.3d 32), is unsupported by (and indeed may be irreconcilable with) the evidence on which BPT purported to rely. Accordingly, the BPT's reliance on this factor was arbitrary and capricious. (*Scott*, at pp. 891–892, 15 Cal.Rptr.3d 32.)

### B. *Unstable Social Relationships*

[11] The only other finding cited by the BPT to support its prognostication that Shaputis posed an unreasonable risk of danger to society if released on parole was that he had a "history of unstable and tumultuous relationships with others." However, the evidence showed that, apart from his alcohol-related marital disharmony and his misconduct with one of his daughters, apparently also while he was intoxicated, Shaputis had no history of unstable or tumultuous relationships. To the contrary, the evidence showed (despite the persevered (despite the mother's description of the family) by surrogate parenting, his siblings until one left home to begin his adult life. He thereafter maintained relative stability in his occupational endeavors, and continued to be in contact with his workmates even after he was imprisoned

relationships. (*Cf. In re Deluna* (2005) 126 Cal.App.4th 585, 594–595, 24 Cal.Rptr.3d 643.) BPT also asserts Shaputis's estrangement from his siblings (after he left home to begin his adult life) and the absence of any contacts with his daughters (since his imprisonment) is evidence he has "trouble maintaining relationships."  However, the complete absence of any relationship between Shaputis and his siblings necessarily precludes that relationship from being either tumultuous or unstable. Similarly, the fact Shaputis's daughters seek to have nothing to do with him after he was imprisoned is not necessarily inconsistent with a finding that such relationships were either tumultuous or unstable.

335    IN RE SHAPUTIS
Cite as 37 Cal.Rptr.3d 324 (Cal.App. 4 Dist. 2005)

His first marriage lasted nine years (slightly longer than the national average) and he was a sufficiently stable father that he was awarded custody of the children of that union, although he did plead no contest to misdemeanor soliciting or engaging in a lewd act with one of his daughters. His second marriage, ended by the commitment offense, lasted 23 years. Finally, his postincarceration conduct was exemplary (evidencing no inability to maintain stable interpersonal relationships) and he has feasible and appropriate postrelease plans for housing, employment, and familial and community support networks.

Shaputis contends there was "some evidence" (Rosenkrantz, supra, 29 Cal.4th at p. 667, 128 Cal.Rptr.2d 104, 59 P.3d 174) he had a "tumultuous relationship" with Irma.[11] However, the evidence was uncontradicted that Shaputis's abusive behavior toward Irma (including "the commitment offense") was intertwined with his alcoholism, and the only evidence was that he posed a low risk for future violence so long as he did not relapse into alcoholism. Because the only evidence was that Shaputis had actively participated in AA and NA since 1991 and his alcoholism was in "sustained remission," and the BPT neither found nor cited any evidence suggesting Shaputis's commitment to his sobriety was feigned or tenuous, there is no evidence to support the conclusion that Shaputis posed an unreasonable risk to public safety if paroled.

In In re Smith, supra, 114 Cal.App.4th 343, 7 Cal.Rptr.3d 655, the court evaluated an analogous determination denying parole to an inmate convicted of the second degree murder of his wife.[13] In Smith, the

[13] Because the language of the relevant subdivision permits the BPT to consider whether Shaputis had "a history of unstable or tumultuous relationships with others" (§ 2402, subd. (c)(3), italics added), the language appears to contemplate that a prisoner can be

Governor cited the inmate's history of social instability, substance abuse and violence against his wife to conclude there was a danger the inmate might become violent if released into the community. (Id. at p. 368, 7 Cal.Rptr.3d 655.) Smith concluded the implied rationale for the finding of dangerousness—the inmate's deeply entrenched substance abuse problem raised a danger he would relapse into drug use and become violent—was unsupported by any evidence. First, all of the contrary evidence on the issue was to the effect the inmate had remained clean and sober for many years; he had fully participated in therapy and treatment programs and had remained discipline-free in prison; and the opinions of both the prison staff and a psychologist was that his drug problem was in full remission; and he posed a low degree of threat to the public. (Id. at pp. 371–372, 7 Cal.Rptr.3d 655.) Against this evidentiary showing, Smith concluded the Governor's contrary finding was "arbitrary and capricious, reasoning ...

"In sum, the sole 'factor' cited by the Governor—Smith's unrestricted desire for drugs due to long-term abuse—does not constitute some evidence that Smith might start using drugs and become violent again. Indeed it shows neither that currently poses an unreasonable risk of danger without further treatment. Indeed, if Smith's past use of drugs did invariably 'establish' his unsuitability, then the Governor could deny parole for the rest of Smith's life based on this immutable factor, without regard to or consideration of subsequent circumstances, and evidence indicating that he

deemed unsuitable if he was chronically unable to form stable relationships. We therefore question whether the contends can be satisfied by evidence of a single tumultuous relationship.

there has no current desire for drugs and that there is little current likelihood of drug relapse...let alone a return to violent conduct as a result of it. Moreover, the Governor's conclusion, that Smith currently would pose an unreasonable risk of violent criminal conduct if released without further drug treatment appears to be arbitrary and capricious because, as noted, his decision omits any consideration of or even reference to, the undisputed evidence noted above. [¶] In this regard, we point out that in Rosenkrantz the court stated that to ensure due process, "the Governor's decision must reflect due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards." (quoting Rosenkrantz, supra, 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.) Here, however, the Governor's decision omits any consideration of relevant evidence and the numerous factors... that tend to show suitability, including that Smith committed the crime while under stress, he has shown great remorse for the crime, his age makes him less of a potential threat, he has developed marketable skills, he has wide support and realistic plans for the future, and during his lengthy incarceration, he has long participated in drug treatment and psychotherapy and has devoted himself to self-improvement and volunteer work with other troubled prisoners." (Smith at p. 372, 7 Cal.Rptr.3d 655.)

We are similarly convinced the BPT's reliance on Shaputis's marital and alcoholism-related violence toward his wife to buttress the sole evidence considerably supporting the finding he had "unstable or tumultuous relationships" with others, persons, cannot justify a finding Shaputis currently poses an unreasonable threat to others if released on parole absent some evidence there is a current likelihood Shaputis will

be unable to maintain his sobriety on parole. (In re Smith, supra, 114 Cal.App.4th at p. 372, 7 Cal.Rptr.3d 655; cf. Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 916 [although reliance on conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law, where inmate over time continues to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of prior conduct would raise serious questions involving his liberty interest in parole]; accord, Irons v. Warden of California State Prison–Solano (E.D.Cal.2005) 358 F.Supp.2d 936, 947 and fn. 2.)

Shaputis exhibited no violent tendencies toward anyone other than his wife and one of his daughters, and the violence he demonstrated was intertwined with his alcohol problem. The only evidence before the BPT was that Shaputis had more than a decade of disciplinary-free commitment to remaining sober, and there was not a scintilla of violence in his heavily two decades of incarceration. Accordingly, the BPT's conclusion Shaputis remained a danger to society, to the extent it was premised on a former lifestyle that all of the evidence showed was a historical relic, is so lacking in any medical, psychological or behavioral evidentiary support that it is arbitrary and capricious, within the deferential standards articulated by Rosenkrantz, supra, 29 Cal.4th 616, 128 Cal.Rptr.2d 104, 59 P.3d 174.

V

THE APPROPRIATE DISPOSITION

[12] We recognize the BPT's task is difficult because it seeks to predict which inmates may safely be released to society. Although Rosenkrantz cautions that a reviewing court must not engage in second-

**37 CALIFORNIA REPORTER, 3d SERIES**

guessing what necessarily are subjective decisions, we are at the same time bound to insure that the inmate is accorded the basic requirements of due process, and where there is no evidence to support the BPT's decision, that an inmate is unsuitable for parole and would pose an unreasonable risk of danger to society if released, those minimum requirements have not been met.

In the present case, we conclude the record contains no evidence to support the BPT's articulated reasons for denying parole, and there is "nothing in the record to suggest the BPT would have determined Shaputis posed an 'unreasonable' risk of danger to society without the reasons we have found are unsupported by the record. It follows that we cannot conclude Shaputis received the basic requirements of due process and the BPT's decision must be therefore be reversed. Accordingly, we reverse the BPT's decision and the matter is remanded to the BPT with directions to conduct a new parole suitability hearing consistent with this opinion, and to issue a new decision within 45 days of the date of this order becoming final.

[12]  Although we conclude the record before us contains no evidence to support the BPT's decision finding Shaputis unsuitable for parole, we recognize we cannot predict in advance what evidence will be available when the BPT conducts the new parole suitability hearing, particularly because more than 18 months have elapsed since the hearing challenged in this proceeding. Because "a reviewing court is precluded from independently resolving conflicts in the evidence, determining the weight to be given the evidence, or deciding the manner in which the specified factors relevant to parole suitability are to be considered and balanced, because these are matters exclusively within the discretion of the [BPT]' (Scott, supra, 119 Cal. App.4th at p. 899, 15 Cal.Rptr.3d 32), we

are precluded from directing the BPT's consideration of how new evidence that has yet to be presented. We therefore conclude, although the BPT may not find Shaputis unsuitable for parole based on the same evidence and findings articulated at the 2004 hearing, if new evidence is presented at the 2004 hearing, the BPT may consider Shaputis's suitability considering that new evidence, if any.

## VII.

## DISPOSITION

Shaputis's petition for writ of habeas corpus is granted. The BPT is ordered to vacate the denial of parole, and to conduct a new parole suitability hearing for Shaputis, and to issue a new decision within 45 days.

## I CONCUR: McINTYRE, J.

## BENKE, J.

I dissent.

Respectfully, there is no legal basis for granting relief in this case.

In In re DeLuna (2005) 126 Cal.App.4th 585, 591, 24 Cal.Rptr.3d 643, the court held: "When a decision by the Board denying parole is challenged, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation.' [Citation.]" (See In re Rosenkrantz (2002) 29 Cal.4th at pp. 658, 677, 128, Cal.Rptr.2d 104, 59 P.3d 174.) The Rosenkrantz court stated: "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the crime reasonably could be considered more aggravated or violent than the minimum necessary to

**IN RE SHAPUTIS**
Cite as 37 Cal.Rptr.3d 324 (Cal.App.4 Dist. 2005)

sustain a conviction for that offense.'" (Id. at p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

In re Dannenberg (2005) 34, Cal.4th 1061, 23, Cal.Rptr.3d 417, 104 P.3d 783 (Dannenberg) further clarified the applicable standard under which the Board of Prison Terms fixes parole release dates for those imprisoned for indeterminate terms. It holds: "[T]he Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life maximum prisoner's crime individually. While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (Id. at p. 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783, italics omitted.) The court rejected the argument that, given an indeterminate life prisoner, the board must for a date of parole release unless it finds the prisoner's crime particularly egregious in comparison with other offenses of the same class. Instead, the court held the board may decline to set a parole date in an individual case 'if it concludes, on relevant grounds with support in the evidence, that the grant of a parole date is premature for reasons of public safety.' (Ibid.)

Clearly, if an inmate is not suitable for parole because considerations of public safety demand a more lengthy period of incarceration, the Board of Prison Terms is not required to set a release date. Our review of the board's decisions is highly deferential and only a modicum of evidence is needed to support the board's decision. (In re Rosenkrantz, supra, 29 Cal.4th at p. 667, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

This deference is based on two important considerations: first, the board reviewing the discretionary actions of a separate branch of government; and second, the board has far greater expertise and experience in dealing with determining public safety than do the courts.

With these considerations in mind, there is certainly a modicum of evidence to support the denial of parole in this case.

The board gave two general reasons for concluding petitioner is an unreasonable risk of danger to public safety. First, it found the true and callous manner of the murder petitioner committed, and the second was petitioner's history of unstable and "tumultuous" relationships with others.

What clearly emerges from the parole suitability hearing and petitioner's psychological evaluation was that petitioner was for a long time a physically abusive man in which he engaged in abusive behavior, which often occurred when drunk. The crime here, when his colleagues euphemistically refer to a alcohol-related marital dispute, involved petitioner, after a night of heavy drinking, his wife in the back of the house, and the couple, then shooting his wife in the face at close range, apparently a part of a pattern of years, consisting in part of routine beatings, marked ribs and a previous incident where petitioner shot at her and missed. The underlying cause of the murder and previous violence was petitioner's drinking.

As one might expect, and as my colleagues emphasize, when petitioner is away from alcohol, he is a model inmate. His prison disciplinary history, at the time of the hearing was spotless. He had done well. The critical discretionary task, however, was to make a prediction of his behavior outside the highly structured and restrictive setting of prison. The psychologist who evaluated petitioner qualified his conclusion that if released petitioner

338    37 CALIFORNIA REPORTER 3d SERIES

would be a low risk to the community by stating repeatedly this was true only if petitioner avoided the use of alcohol. As is expressly noted in the psychologist's report. The above information suggested that Mr. Shaputis presented at low risk for violence, providing that he maintains his sobriety and keeps busy with activities which hold his interest."

Importantly, the psychologist's report attached as Exhibit B to the petition notes that the underlying causes of petitioner's alcoholism have not been eliminated during his time in prison. Thus despite a "low risk" profile, his ability to maintain alcohol-free outside prison is problematic. The report notes: "During the evaluation his innate evidence and some insight." However, he still maintains a high level of denial and rationalization which are likely to remain with him forever," and they serve two (sic) protective and help him handle behaviors which he cannot accept in himself. In other words, as Dr. Saunders so aptly noted in 1994 and 1997, full to personality factors (Mr. Shaputis) is not likely to seek further improvement. The report, in this case, while there are positive factors supporting parole, there are also negative factors ... In this respect, the core factors in this instance are firmly entrenched and unlikely to change." The report also concludes: "Mr. Shaputis has yet to accept full responsibility for the controlling offense and still seems to pay lip denial and minimization to hide his stress. However, if this point in his life, such defenses are firmly entrenched and unlikely to change."

Given petitioner's long history of alcoholism and the psychologist's conclusion that his basic character was unchanged, the prison board could rationally conclude that if released at this time to a less

structured setting, petitioner would pose an unreasonable risk to the community.

My colleagues return this case to the board with instructions to hold a new hearing, at which time more information or evidence must be introduced than was introduced at the hearing from which this petition arose. Assuming there is no different evidence, it appears my colleagues favor the setting of a release date for petitioner. It is apparently their conclusion that despite the psychologist's report, petitioner does not remain a risk to public safety, will not get drunk and will not relapse into dangerous conduct. With all the respect, such conclusions are not the prerogative of this court as long as the record supports the board's action by a modicum of evidence. Respectfully, what is ultimately lacking is not a modicum of evidence but a modicum of judicial restraint.

I would deny the petition for writ of habeas corpus.



The NEW YORK TIMES COMPANY, Petitioner,
v.
The SUPERIOR COURT of Los Angeles County, Respondent;

Wall Street Network, Ltd., Real Party in Interest.

No. B183768.

Court of Appeal, Second District, Division 4.

Dec. 28, 2005.

Background: Newspaper filed cross-complaint against advertising company for

NEW YORK TIMES v. SUPERIOR COURT    339
Cite as 37 Cal.Rptr.3d 338 (Cal.App.2 Dist. 2005)

breach of contract to generate subscriptions on Web sites of marketing alliance partners. The Superior Court of Los Angeles County, No. BC304596, James R. Dunn, J., granted cross-defendant's motion for reconsideration of order granting newspaper summary judgment. Newspaper petitioned for writ of mandate.

Holding: The Court of Appeal, Epstein, P.J., held that new evidence justified grant of reconsideration motion.

Petition granted.

1. Motions
A party seeking reconsideration of an order based upon new or different facts, circumstances, or law must provide a satisfactory explanation for the failure to produce the evidence at an earlier time.
West's Ann.Cal.C.C.P. § 1008.

2. Appeal and Error
A trial court's ruling on a motion for reconsideration is reviewed for abuse of discretion.

3. Judgment
If trial court erred in granting motion for reconsideration of order summary judgment order in favor of newspaper on cross-complaint against advertising company for breach of contract to generate subscriptions on Web sites of marketing alliance partners, where motion was based on evidence known prior to judgment is before the summary judgment hearing; the evidence was from deposition of alliance partners obtained by newspaper two days before hearing, and, although the evidence was new to the trial court, it was available to advertising company throughout the discovery process and was easily obtainable, as demonstrated by the depositions, and there was no satisfactory explanation for failure to produce, the failure to present it earlier in West's Ann.Cal. 3(c) 3.§ 1008(a) to justify.

See also 6 Witkin, Cal. Procedure (4th ed.), § ... Witkin, Cal. Proc. § ... Cal. Procedure ...

4. Judgment
A continuance of a summary judgment hearing by affidavit that a combination is needed to obtain facts essential to justify opposition to the motion. West's Ann.Cal. C.C.P. § 437c.

Counsel and Advocates

Brown, Keegan & Winkler, Kandel & Steiner, Alan Caplan, Pamela G. Marsh, and Pamela K. Woodside for Petitioner.

No appearance for Respondent.

Epstein, P.J.

The New York Times Company (the Times) filed a ... case decided after the trial court ruling. Section 1008 authorizes ... construed in La Francois v. Goel (2005) 35 Cal.4th 1094, 29 Cal.Rptr.3d 249, 112 P.3d 636, La Francois, a case decided after the trial court ruling.

1. All statutory references are to the Code of Civil Procedure ...

# EXHIBIT B

As already noted, Philip Morris in this case presented no evidence to the jury of any other punitive damages award but nonetheless has asked that we consider two specific prior California punitive damages awards, including *Boeken v. Philip Morris, Inc.*, *supra*, 127 Cal.App.4th 1640. For the reasons set out earlier (see fn. 26, *ante*), we decline to do so and reject the reasoning of *Boeken* in that regard. With respect to the MSA, we conclude that Philip Morris's agreement not to engage in certain conduct is neither punishment nor an effective deterrent and does not reduce the need for punishment and deterrence, as we have stated.

There is no change in the judgment.

The petitions for rehearing filed by Jodie Bullock and Philip Morris USA, Inc., are denied.

CROSKEY, J.

I CONCUR:
KLEIN, P.J.

In my view, the petition of Philip Morris USA, Inc., should be granted.

KITCHING, J.

# ORDER

*Appellate Opinion Decertified*

Cite as 2006 DJDAR 6008

RICHARD SHAPUTIS
ON HABEAS CORPUS

No. S141547
California Supreme Court
Filed May 17, 2006

Depublication ordered The Reporter of Decisions is directed not to publish in the Official Appellate Reports the opinion in the above entitled appeal filed December 28, 2005, which appears at 135 Cal.App.4th 217. (Cal. Const., art. VI, section 14; rule 976, Cal. Rules of Court.)

# ORDER

*Appellate Opinion Decertified*

Cite as 2006 DJDAR 6008

PEOPLE
v.
GREEN

No. S141726
California Supreme Court
Filed May 17, 2006

Petition for review denied; CA opinion decertified

Petition for review DENIED.

The Reporter of Decisions is directed not to publish in the Official Appellate Reports the opinion in the above entitled appeal filed January 26, 2006, which appears at 135 Cal.App.4th 1315. (Cal. Const., art. VI, section 14; rule 976, Cal. Rules of Court.)



# EXHIBIT C

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 26 2006

John A. Clarke, Executive Officer/Clerk

By _____, Deputy

**LAW OFFICES OF
PICONE & DEFILIPPIS
625 North First Street
San Jose, CA 95112**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re,                              ) Case No.: BH003529
                                    ) ORDER RE: WRIT OF HABEAS CORPUS
ROBERT ROSENKRANTZ,                 )
                                    )
        Petitioner,                 )
                                    )
    On Habeas Corpus                )
                                    )
                                    )
                                    )
                                    )
_____)

        The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17,

2005, as well as the return and denial filed in response to the court's order to show cause.

Having independently reviewed the record, giving deference to the broad discretion of the Board

of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision

denying petitioner parole is not supported by "some evidence."

        Petitioner is currently serving a sentence of 15 years to life with a two-year firearm

enhancement following his 1986 conviction of second degree murder. Petitioner's minimum

eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the

argument that the Board violated its regulations and petitioner's right to due process by its

refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him

an unreasonable risk to public safety if paroled.

        On April 25, 2005, the Board denied petitioner parole for one year.  In denying petitioner

parole, the Board relied upon the circumstances of the commitment offense.  When determining

ep                                      1

1  unsuitability based on commitment offense, the Board may consider as a factor whether the

2  victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15,

3  § 2402(c)(1)(C).) Here, the Board found that the victim was "abused" due to "the number of

4  times he was shot and the manner in which he was shot." In addition, the Board concluded that

5  the case "rises to the highest level of second-degree murder." The Board further stated in its

6  decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed

7  parole. While the Board is required to consider such opposition (see Penal Code section 3042),

8  that opposition is not a factor on which the Board may rely to deny parole as enumerated in title

9  15, section 2281 of the California Code of Regulations.

10      Towards the conclusion of the hearing, the Board summarily mentioned its concern that

11  petitioner is a danger to his brother, Joey. The court finds that this assertion is not only

12  unsupported by the record, but belied by the record, which contains documented evidence that

13  contradicts any fear that the petitioner is a threat to his brother's safety. Furthermore, the court

14  rejects the Board's inference that the absence of yearly supportive letters from petitioner's

15  brother shows that petitioner is a danger to his brother. In fact, the petitioner's denial and

16  traverse draws attention to a recent psychological evaluation addressing and dismissing the

17  Board's concern for the safety of petitioner's brother. However, because this psychological

18  evaluation was not evidence before the Board at the time of petitioner's hearing, the court may

19  not properly rely upon it in reviewing the Board's decision. Regardless, the court finds that there

20  is no evidence in the record that supports the conclusion that petitioner remains a danger to his

21  brother.

22      The Board's sole reliance on the gravity of the offense to justify denial of parole can be

23  initially justified as fulfilling the requirements set forth by state law. (*Biggs v. Terhune* (9th Cir.

24  2003) 334 F.3d 910, 916.) However, over time, should petitioner continue to demonstrate

25  exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the

26  nature of the commitment offense raises serious questions involving his liberty interest in parole.

27  (*Id.* at p. 917.) Here, petitioner's record is replete with reports of petitioner's exemplary conduct

28  as well as his vocational and educational achievements over a period of many years. Indeed,

petitioner is a model prisoner in every respect. A parole decision supported by some evidence may nonetheless abrogate due process if it did not consider and weigh all favorable evidence. (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

The court finds that petitioner's continual parole denials have been based mainly on the gravity of the commitment offense, the circumstances of which can never change. Therefore, the Board's continued sole reliance on the commitment offense will essentially convert petitioner's original sentence of life with the possibility of parole into a sentence of life without the possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936, 947.)

Prior Board panels have found petitioner suitable for parole. Petitioner was found suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the maximum term for both second degree and first degree murder. Therefore, the commitment offense should no longer function as a factor for unsuitability and in that case, it should no longer operate as "some evidence" to support the Board's parole denial. Petitioner has reached the point in which the denial of parole can no longer be justified by reliance on his commitment offense. The Board's continued reliance on the circumstances of the offense runs contrary to the rehabilitative goals espoused by the prison system and has violated petitioner's due process.

//
//
//
//
//

ep                                                3

1    Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2    granted.

3

4    June 26, 2006

5

6                                                    DAVID S. WESLEY

7                                                    Judge of the Superior Court

8    Clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

# CALIFORNIA APPELLATE COURTS

Case Information

**2nd Appellate District**

Change court

Court data last updated: 08/10/2006 11:11 AM

Case Summary   Docket   Scheduled Actions   Briefs
Disposition   Parties and Attorneys   Trial Court

## Docket (Register of Actions)

**The People v. Rosenkrantz et al.**
**Division 1**
**Case Number B192676**

| Date | Description | Notes |
|------|-------------|-------|
| 07/28/2006 | Request for stay filed. | |
| 07/28/2006 | Order filed. | The Court has read and considered Rosenkratz's ptn...and the AG's ptn for writ of supersedeas B192676. The parties are ordered as follows: (1) By ltr brfs via fax or personal delivery on opposing cnsl and filed by 3 p.m., on 7/31/06 and explain (*see order*) (2) If rprtr's transcript of any of the relevant proceedings (including hrng on petn for writ of hc and all subsequent hrngs) have been preprd, they are to be lodged w/this Crt as soon as possible but not later than 3 p.m. on 7/31/06; if the transcpts have not been prepared, they shall be immediately obtained and lodged as soon as possible. (3) Opo to Rosenkratz's emerg. ptn case no. B192599 is to be srvd via fax or by personal srvc on Rosenkrantz's cnsl and filed by 3p.m. on 7/31/06. |
| 07/28/2006 | Received: | cc of notice of appeal by AG w/received stamp of 7/28/06 from Superior Court Crim Appeals Unit |
| 07/31/2006 | Received: | cc of FILED stamped notice of appeal (7/28/06) by AG from LA Sup Crt - CRIM Appeals Unit |
| 07/31/2006 | Letter brief filed. | Attorney: Grossman, Marc Party: Rosenkrantz, Robert |
| 07/31/2006 | Letter brief filed. | Attorney: Office of the Attorney General Party: The People |
| 07/31/2006 | Petition summarily denied | Writ of supersedeas/stay has been read and considered. The petition |

| | | by order. | is denied. (M-V) |
|---|---|---|---|
| | 08/03/2006 | Notice of appeal lodged/received (criminal). | 7-28-06 The People |
| | 08/03/2006 | Letter sent to: | Bouchard |

**Click here to request automatic e-mail notifications about this case.**

© 2004 Judicial Council of California

# EXHIBIT E

# CALIFORNIA APPELLATE COURTS

### Case Information



| | |
|---|---|
| Supreme Court | **Supreme Court**    Change court |
| Welcome | Court data last updated: 08/10/2006 10:53 AM |
| Search | Case Summary   Docket   Briefs |
| E-mail | Disposition   Parties and Attorneys   Lower Court |
| Calendar | **Docket (Register of Actions)** |
| Help | **ROSENKRANTZ (ROBERT) ON H.C.** |
| Opinions | **Case Number S145504** |

## Docket (Register of Actions)

**ROSENKRANTZ (ROBERT) ON H.C.**
**Case Number S145504**

| Date | Description | Notes |
|---|---|---|
| 08/02/2006 | Petition for review with request for stay filed (criminal) | Amanda Lloyd, Deputy Attorney General |
| 08/02/2006 | Exhibit(s) lodged | one bound volume |
| 08/02/2006 | Answer to petition for review filed | Robert Rosenkrantz, petitioner Marc Elliott Grossman, counsel Answer submitted to the court with red covers and labeled "Petitioner's opposition to supersedeas/stay" |
| 08/03/2006 | Petition for review and application for stay denied | |

**Click here to request automatic e-mail notifications about this case.**

© 2004 Judicial Council of California

LAW **OFFICES OF**
**GONE & DEFILIPPIS**
**15  North First** Street
**San Jose, CA** 95112

# PROOF OF SERVICE BY MAIL
## (by a person in state custody)
### Federal Ruled of Civil Proceedure, Rule 5
#### 28 U.S.C. §1746

STATE OF CALIFORNIA    )
                       ) SS.  **Jaime Mijangos v. A.P. Kane, Warden CTF,**

<u>COUNTY OF MONTEREY</u>  )          **Arnold Schwarzenegger, Governor, and**
                                        **Board of Parole Hearings.**

I, _____ Jaime Mijangos _____, am a resident of the State of California, County of Monterey. I am over the age of 18 years and I am a party to the within action.  My business/ residence address is the Correctional Training Facility, P.O. Box 689, Soledad, CA 93960-0689.

On _10/21/07_____, 2007, I served the following:

**Petition for Writ of Habeas Corpus with Exhibits A through K; and Request/Motion**

**for Judicial Notice with Exhibits A through E.**

_____ on the

parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid in the United States Mail in the institution's United States Mailbox at the Correctional Training Facility, Soledad, California , addressed as follows:

**ORIGINAL**

United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102-3483

**COPY**

Office of the Attorney General
Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004

There is a regular service by the United States Postal Service between the place of mailing and the places so addressed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _21st_ day of _October_____, 2007, at Soledad, California.

/S/ _Jaime Mijangos_
Jaime Mijangos